**JAYCO SYSTEMS, INC., Plaintiff-Appellant,**

v.

**SAVIN BUSINESS MACHINES CORPORATION, Defendant-Appellee.**

No. 84–1677.

United States Court of Appeals, Fifth Circuit.

Nov. 29, 1985.

---

Boyd & Dubose, Samuel L. Boyd, Richard Valdes, Dallas, Tex., for plaintiff-appellant.

Carrington, Coleman, Solman, Johnson & Blumenthal, Corbet F. Bryant, Jr., Dallas, Tex., Schnader, Harrison, Segal & Lewis, Thomas A. Greene, New York City, for defendant-appellee.

Before GOLDBERG, REAVLEY and GARWOOD, Circuit Judges.

GOLDBERG, Circuit Judge.

Like a rapidly growing tree in a commercial forest, plaintiff's original complaint in

this case grew to sizable proportions in the six years it took to become a Fourth Amended Complaint. What began as a collection of fraud and contract claims blossomed with the fertilizer of discovery into a cornucopia of antitrust claims as well. By compromise and settlement of the parties, the plaintiff's case has been pruned back to leave only the antitrust claims. After a thorough review of the record, we conclude that although the facts might provide another a fertile field to hoe, the plaintiff here is left without even a stump to stand on. We hope that we have not missed the forest for the trees.

Plaintiff Jayco Systems, Inc. ("Jayco") appeals from the district court's dismissal of its antitrust claims upon Defendant Savin Business Machines Corporation's ("Savin") motion for summary judgment. Savin is a prominent manufacturer of photocopying machines, and Jayco was a Dallas-based independent dealer of Savin and other copying machines. The original dispute arose from Jayco's belief that Savin had fraudulently burdened Jayco's new dealership with the copying industry's version of the Edsel, and that Savin had breached a non-compete agreement. The antitrust claims arise from Savin's success in winning bids for the State of Texas copier business.[1]

Jayco maintains that Savin, through price-fixing, territorial allocations, refusals to deal, and a conspiracy with other dealers and state officials, acted to restrain trade in and monopolize the State of Texas photocopying market in violation of sections 1 and 2 of the Sherman Act. While these elements are present in a confusing potpourri, we find that some of them are, on the record before us, not violations, and that Jayco lacks standing to challenge the remainder.

We first set out the facts in the light most favorable to Jayco. We then narrow down the scope of our inquiry by finding that Jayco, to its misfortune, lacks standing to challenge those practices that, if a violation were found, would yield the greatest damages. Finding thereafter that those practices that Jayco has standing to challenge do not constitute *per se* violations of Section 1, we dispose of Jayco's Section 2 claim and its remaining Section 1 claims by finding that Jayco has failed to demonstrate a relevant market. Although Jayco points to uncontroverted damages of $9,510,824.00, we conclude that its damages amount to not even a fico.

## I. FACTUAL BACKGROUND

This case comes before us on appeal from a summary judgment. The dismissal of antitrust cases on the basis of summary judgment is generally disfavored, as the claims often involve labyrinthine fact patterns and issues of intent and motive best left to the jury.[2] Nevertheless,

we have recognized that a plaintiff may not immunize himself against the entry of summary judgment simply by alleging a violation of the antitrust laws. As in other types of cases, if the pleadings and accompanying evidentiary materials, when viewed in the light most favorable to the non-moving party, raise no "genuine issue as to any material fact," and it appears that the moving party is entitled to judgment as a matter of law, the court may properly enter judgment. Moreover, the party opposing summary judgment may not rely merely on the pleadings or even on conflicting testimony, but must introduce *"significant evidence* demonstrating the existence of a genuine fact issue." [3]

*Columbia Broadcasting System, Inc.,* 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962).

**3.** *Walker v. U-Haul of Mississippi,* 734 F.2d 1068, 1070–71 (5th Cir.1984) (citations omitted).

---

**1.** "State of Texas copier business" refers to the copying needs of the government of the State of Texas. We have adopted the language used by both parties.

**2.** *See, e.g., Aladdin Oil Co. v. Texaco, Inc.,* 603 F.2d 1107, 1111 (5th Cir.1979), *citing Poller v.*

With these admonitions in mind, we now proceed to set out the facts in the light most favorable to Jayco.

Savin[4] is engaged in the nationwide marketing of copiers, their parts, and supplies. It sells at the retail level through branch offices and divisions which handle major or national accounts and placements with governmental agencies. It also sells to hundreds of authorized dealers, among which was Jayco, for resale or rental to end users. Dealers also act as commissioned agents for the provision of services to major accounts and government agencies that contract directly with Savin.

Jayco is a Texas corporation that was formed in 1974 by Jim and Shirley Woznick and their son-in-law, Jerry Andreff, for the purpose of beginning a photocopier dealership in the Dallas area. In November-December, 1974, various written agreements were concluded between Jayco and Savin by which Jayco acquired assets of the Savin branch office in Dallas and became an authorized dealer of Savin equipment for a term of three years. Jayco also became a dealer of other copiers, including primarily those manufactured by Canon. After the three year authorized dealership for Savin products expired in late 1977, Savin notified Jayco in February, 1978, that it would not renew the dealership. Jayco and Savin have compromised and settled all claims arising from the dealership agreements. The settlement includes Jayco's release of any claim for wrongful termination.[5]

Prior to the introduction of a new model, business for both Savin and Jayco had been poor. Dependent upon the Savin 300 series copier, which by all accounts was a dud of a machine, both sustained substantial losses.[6] Savin's engineers, however, unfazed by their lack of success with the 300 series, redeemed themselves with the 700 series in late 1975 and early 1976, when Savin began marketing these liquid toner copiers. The copiers were very successful, and Savin's advertisements later claimed that they outsold Xerox and IBM combined.[7] Savin's

---

**4.** Savin Business Machines Corporation was a New York corporation with its principal place of business in New York. It was merged into Savin Corporation, a Delaware corporation, which until 1983 had its principal place of business in New York, and thereafter in Connecticut.

**5.** The relevant portion of the Settlement Agreement reads:

There is reserved to Jayco the right to appeal (and all other rights emanating from such appeal as described below in this paragraph) that portion of the Dismissal Order which granted summary judgment to Savin dismissing the claims set forth by Jayco in the Fourth Amended Complaint that (i) Savin monopolized or attempted to monopolize in violation of Section 2 of the Sherman Act the sale and rental of photocopier machines and supplies to agencies of the State of Texas between May 1976 and August 31, 1981; and (ii) Savin engaged in an unlawful conspiracy in restraint of trade in violation of Section 1 of the Sherman Act with respect to the sale and rental by Savin of photocopier machines and supplies to agencies of the State of Texas between May 1976 and August 31, 1981. This exception does not encompass or preserve any claim, whether for alleged violation of state or federal anti-trust laws, for any alleged wrongful termination of Jayco's dealership, any alleged conspiracy or boycott relating in any way to sales or rentals in the Dallas-Fort Worth area (other than sales and rentals expressly made to State of Texas agencies), any alleged refusal to deal not directly related to machines for State of Texas business, any alleged predatory pricing or price fixing not directly involving State of Texas business, or any alleged monopolization or attempt to monopolize other than directly involving State of Texas business.

**6.** Savin's financial statement showed a net loss for the 1974 fiscal year of $10,248,000. Jayco had losses of $11,000 in 1975 and also sustained losses in 1976.

**7.** The only evidence, which is really no evidence at all, as to any market share, other than Savin's share of the State of Texas copier business, comes from the following exchange between Jayco's counsel and Max Schultes, Savin's vice-president of copier development:

Q: I have read some Savin advertisements and I may not be using the exact words, but are you aware of advertisements of Savin that have said that you are now outplacing Xerox and IBM combined?
A: Yes, that's right, with numbers of machines, which is a different—if you go quantity of copies, it's a different ballgame.
Q: But the number of machines?
A: The number of machines we have placed.
Q: The two combined?
A: Yes, that's the advertisement.

refusal to supply Jayco with the first model in the new series, the Model 750, for bids for the State of Texas copying business in 1976, forms the basis of Jayco's principal complaint.

The State of Texas has an established competitive bidding program for the award of contracts to supply state agencies with photocopier equipment and supplies. In May-June of each year, the State solicits bids to satisfy its low, medium, and high volume copying requirements. The State is divided into several regional zones, and bidders may choose to compete for the whole state or any one of the zones. After submission of bids and a review and evaluation by the State Purchasing Commission, the Commission awards annual contracts beginning on September 1 for the rental of copiers in the various volume ranges. In late August-September of the same year, separate bids are entertained and contracts awarded for dispersant, toner, paper, and other supplies. During the course of the contract year, agencies also place "open market" orders for specific needs.

Although the bids for machines and supplies occur separately, a supply bid can make or break the earlier bid for the machines. While one company's bid on the machines may be lower than another's, the price of the copier is not the only factor. Rather, bids are awarded on the basis of cost per copy, a figure that necessarily involves consideration of a copier's supply costs. While a bidder can rely on the list price of its supplies, it may be compelled to submit a more competitive supply bid in order to ensure the success of its copier bid.

Prior to Savin's refusal to supply its dealers with machines for state bidding, several independent dealers expressed interest in bidding the Model 750 for the State business in 1976. Jayco's Jerry Andreff, who had previously obtained a State contract while working for Saxon, another manufac-

turer of copiers, discussed the possibility of bidding the 750 with Art Nendick, a vice-president of Savin. Rec. at 962–63. Nendick, according to Andreff, originally expressed interest. Sometime in late 1975 or early 1976, however, Savin decided that it alone would bid the Model 750 for the contract year beginning in September, 1976. Andreff, realizing that Savin machines would not be forthcoming, left Jayco in April 1976 and opened his own dealership in copiers other than Savin's.

Savin eventually bid the contract for the whole state, although as late as the night before the bid opening in June, Robert Mayes, an Austin dealer, still believed that he would be able to bid for the Austin zone. Savin disabused Mayes of this idea the following morning, but sweetened the bitter pill with a promise that his dealership, Modern Methods, would be granted a service fee for each machine installed under the State contract and given the right to bid toner and dispersant.

The parties dispute when Savin actually won the copier contract. The record, as far as we can discover, does not contain the simplifying expedient of a letter from the State to Savin officially awarding the contract prior to the starting date of the contracts themselves on September 1. What is clear is that only after Savin refused to allow Jayco to bid on the copier contract, and after Savin itself bid in June, do clouds of conspiracy appear on the horizon and the plot begins to thicken.

Enter Mr. Trent Fowler, a state official in the auditor's office in Austin. Although he lacked responsibility for awarding the bids, he did have responsibilities that apparently allowed him to inspect all the bids. He makes his first appearance for our purposes the night before the bid opening in June at an outdoor restaurant in Austin named, forbodingly enough, Convict Hill. That night he met alone with Nendick to tell him that Savin was not the low bidder,

---

Q: Is it true?
A: It's true. Data Quest came out with that. Depo. of Shultes, "Q" at 103. IBM and Xerox were not the only other players in the field.

Other competitors included Canon, Saxon, Sharp, Royal, and Minolta. *Id.* at 105.

and that Savin would have to offer guarantees on the 750's drum life to keep the cost per copy down. Fowler also apparently told Nendick that Savin would have to re-bid the toner and dispersant.[8]

There are two other meetings that form the basis of Jayco's claims, but the timing of them is not at all clear. One occurred in August of 1976 in Austin after Savin had bid $45 per case of toner and dispersant (called a "TD pack" in the trade). Several dealers, not including Jayco, were present. Robert Mayes recalls the meeting and his role in it:

> The apparent purpose of that meeting was for Savin and Mr. Fowler to explain to the dealers the manner in which the State of Texas business would be administered, as well as to secretly coordinate a toner and dispersant bid plan by which some of the dealers would rebid Savin supplies in order to make the Savin contract the 'low bid' under the State's 'cost per copy' formula.
>
> ... Mr. Fowler ... informed me what the cost per copy had to be in order for Savin to be the low bidder and to be awarded the copier contract. I relayed this information to Savin, and the price at which toner and dispersant was to be jointly bid by the participating dealers was determined for us by Savin.

Aff. of Mayes, Rec. at 1538–39.

Because the price at which the three dealers were told to bid the TD packs would not permit them a reasonable profit margin, Savin offered them the TD packs at a $9 discount. As Mayes recalls, the discount gave the three dealers "a nice price advantage over all other Savin dealers in [their] day-to-day business, as well as in connection with the State business." *Id.* at 1539. After Savin had offered Mayes and two other dealers the special discounts, "[a]ll three dealers, with the approval of Savin, agreed on territories [they] would serve and the price at which [they] would bid the toner and dispersant." *Id.* at 1539–40. It seems apparent that without this bid by the three dealers, which was apparently made possible by inside information provided by Trent Fowler, Savin would not have won the contract.[9]

The other meeting took place in North Dallas sometime in the fall after Savin had won the bid. Dealers from Dallas, Austin, and Houston were present, and the subject was the allocation of responsibility for administering the Texas contract. Because Savin had limited capabilities of its own in Texas, it had to rely to a great extent on its independent dealers to service the contract. Thus, while Savin refused to let anyone but itself sell or rent its machines to the State, it still required its dealers for placement, installation, and servicing. Accordingly, at this meeting Savin and the dealers discussed the "servicing and the placement of any machines, and the sale of any machines off of that bid price, and the sale of all supplies associated with these machines."[10] Apparently, those present also discussed territorial allocations.[11] Mr. Woznick re-

---

**8.** Depo. of Henricksen, "XX" at 21–22.

**9.** According to Mayes, Saxon would have won. *Id.* at 1538.

**10.** Deposition of Woznick, "DD" at 37–38.

**11.** During his deposition, the following exchange took place between Arthur Felcoff, the Savin branch manager in Dallas, and Jayco's counsel:

> Q: Would you describe, for the record, the nature of the meeting and who was present?
> A: There was a conflict as to which dealers would handle which State agencies. *And in order to simplify things for the State and the corporation we met and discussed who would handle which accounts and came to an agreement at that meeting.*

> Q: Was that in any way, sir, directed to the fact that independent dealers had been competing for the same State agency rental business?
> A: That's correct.
>     \*    \*    \*    \*    \*    \*
> Q: And would you tell us in what way and why there would be competition between the dealers in connection with the rental contract? Would you describe that for us?
> A: The pricing was the same whether the branch offered it or whether the dealer offered it. And it became a question of which outlet the State agency felt more at ease with doing business.
>     \*    \*    \*    \*    \*    \*

fused to participate, telling Nendick that Jayco then "had all [the business] we could handle."[12]

In the following years, Savin's hold on the State's business strengthened, until in 1978, Savin held the contracts for all volume ranges up to 75,000 per month. After 1976, Savin apparently channeled all its bids through Unicopy, an independent dealership in Austin that had acquired Modern Methods. Bid prices for both the annual rental contracts and open-market prices were determined jointly by Savin and Unicopy.[13] In her affidavit, Mary Wilson, the former Savin manager from 1980 for the State of Texas copier contracts, testified that Trent Fowler assisted Savin and Unicopy in formulating the bids.[14] Savin did not tolerate any competition from its other dealers, and it threatened to terminate any dealership that "rocked the boat."[15]

The record contains some evidence that Savin threatened to terminate dealers who bid non-Savin toner and dispersant competitively against Savin or its dealers. Savin also forbid dealers from buying toner and dispersant for Savin machines from manufacturers other than Savin.[16] A Savin employee policed dealers' inventory, looking for infractions of the rule against dealing in competitors' products. Savin threatened those dealers with termination if they did not comply.[17]

Although there were isolated instances of rebellion against Savin's management of the State contracts, most dealers apparently refused to rock the boat. As Neil Henricksen, a Savin representative in Texas, relates, "We had a pretty sweet arrangement. Savin did at that time set up for everybody as far as compensation for the dealers, and they were handsomely paid, and it was pretty much felt with the kind of money they were getting, which was more than what they were due, that if they didn't cooperate they would be canceled."[18]

Q: Would you tell me if there was anybody from Savin there that was kind of moderating the discussion?

* * * * * *

A: Mr. Nendick was the moderator, the mediator between the dealers and the branch on who would have the right to call on which State agencies.

Q: All right, sir. So at that time this meeting is it correct that you met with your competitors and you decided which one of the contracts each would call on.

* * * * * *

A: That's a fair statement.

Q: All right, sir. And after meeting with the competitors and deciding the contracts that you would call upon, did that cease a lot of the problems that you were encountering with State contracts?

A: Yes.

Deposition of Felcoff, "FF" at 28–32. (emphasis added).

12. Deposition of Woznick, "DD" at 38. Although he told Nendick that he had all the business he could handle, in his deposition Woznick offered the following reason for his refusal: "Well, first of all, I don't think it's morally right for all competitors to gather to find out who's going to do what, nor do I feel it's legal dividing up a territory and dictating what prices are going to be quoted." *Id.*

13. By affidavit Larry Stutes, formerly Savin's Director of Field Operations, Dealer Division, testified:

The Savin Corporation submitted the State of Texas copier bids only after due discussion and evaluation with the Austin Savin dealer. After 1976, such communications were principally with Unicopy and Mr. Lawson [of Unicopy].... The independent Savin dealers were not allowed to compete with or bid against the coordinated efforts of Savin and Unicopy. The Savin Corporation had a practice, in fact, of not allowing such competition, and that practice was made evident to all of the various Savin dealers in the State of Texas.

Rec. at 1500–01.

14. Aff. of Wilson, Rec. at 1416–17: "Mr. Trent Fowler's continuing contribution was to monitor the bidders, the prices bid against the Savin equipment, as well as copier requisitions from the various State agencies, prior to the submission of such requests to vendors for bids. Mr. Fowler kept our office and Mr. Lawson informed of these matters in order that Savin might increase and successfully protect its State of Texas copier population."

15. Depo. of Henricksen, "XX" at 31.

16. Aff. of Mayes, Rec. at 1541–42.

17. Aff. of Stutes, Rec. at 1501–02.

18. Depo. of Henricksen, "XX" at 31–32.

In all of this, Jayco never bid any Model 750 copiers or supplies, for either rental or open market sale, nor did Jayco ever bid toner and dispersant, or, as had Mayes, any non-Savin TD packs. In fact, Jayco had become an exclusive dealer of Savin products by May of 1976. Jayco did have, however, some experience in bidding for State business, but none of it was on the scale of the contract that Jayco claims it would have won. In 1975, it bid successfully on the sale of approximately sixty Canon copiers. This sale of approximately $200,-000 required no financing. It also unsuccessfully bid Savin 300 copiers for a rental contract in one zone in 1975. Primarily because of the burden of carrying the Savin 300 copiers, Jayco's financial condition during the period of its dealership was weak, and it lost money during its first three years of operation. In July, 1976, Woznick wrote Savin that, due to the continuing burden of monthly note payments on the 300 copiers and a non-compete note with Savin, Jayco was "not in a position to rent 750 copiers—even if we were able to obtain ample machines." [19]

Jayco argues that the sum of Savin's activities amounts to a successful attempt to monopolize the State of Texas copier business in violation of § 2 of the Sherman Act. Jayco also claims that Savin's road to monopoly was paved with violations of § 1. Jayco claims that Savin's refusal to supply Jayco with the machines it needed to make a state-wide bid was an unlawful refusal to deal, and that Savin's subsequent enlistment of its independent dealers to service the contract gave rise to a group boycott. Jayco also claims that Savin's management of the State contracts indulged in unlawful territorial and customer allocations, that

the use of Trent Fowler and Unicopy gave rise to unlawful price-fixing, and that the 1976 supply bid involved resale price maintenance.

## II. STANDING

To bring a private, treble damage suit under the antitrust laws, a plaintiff must show that it has standing under § 4 of the Clayton Act, 15 U.S.C. § 15.[20] The plaintiff must show that it has suffered injury to its "business or property" of a type the antitrust laws were intended to prevent. *See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 487–88, 97 S.Ct. 690, 696–97, 50 L.Ed.2d 701 (1977); *Hayes v. Solomon,* 597 F.2d 958, 973 (5th Cir. 1979), *cert. denied,* 444 U.S. 1078, 100 S.Ct. 1028, 62 L.Ed.2d 761. Jayco claims that it suffered injury when Savin's refusal to allow it to bid competitively denied Jayco the profits from the state contract. We grant, and Savin does not dispute, that if a violation is shown, Jayco's injuries, if any, are an "antitrust injury." *Pueblo Bowl-O-Mat,* 429 U.S. at 488–89, 97 S.Ct. at 697.

Savin claims, and the district court agreed, however, that Jayco has not shown the requisite injury to its "business or property." Where a business expansion—as Jayco's venture into statewide bidding would have been—is contemplated, "[t]here must be a showing of intent to expand and of preparedness for the expansion." *Martin v. Phillips Petroleum Company,* 365 F.2d 629, 633 (5th Cir.1966); *Hayes v. Solomon,* 597 F.2d at 973. This rule denies recovery to those persons who, because the existence of their business was entirely speculative, could not have suffered injury

**19.** Depo. of Woznick, "I", Def.Ex. No. 6.

**20.** *Reiter v. Sonotone Corp.,* 442 U.S. 330, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979). 15 U.S.C. § 15 reads, in pertinent part: "Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor ... and shall recover threefold the damages by him sustained...." For a discussion of the differences between antitrust standing and constitutional standing, see D. Berger & R. Bernstein, *An Analytical Frame-*

*work for Antitrust Standing,* 86 Yale L.J. 809, 813 (1977).

In *Nichols v. Mobile Board of Realtors,* 675 F.2d 671, 675–76 (5th Cir.1982), we stated "Private antitrust liability ... requires the showing of (1) a violation of the antitrust laws, (2) the fact of damage, and (3) some indication of the amount of damage (citations omitted). The requirement of the 'fact of damage,' also called 'impact,' means that the antitrust violation must cause injury to the antitrust plaintiff."

in fact. While recognizing that the plaintiff need not show an injury to an ongoing business, the rule serves to protect defendants from multiplicative recoveries.[21]

■ Because Jayco alleges injury to a business expansion it never achieved, Jayco must demonstrate first that it intended to bid on the state contracts, and second, that it was prepared to bid on the contracts. Furthermore, Jayco must show a high likelihood that it would have won the competitive bid but for the alleged violations of the antitrust laws. *Affiliated Capital Corporation v. City of Houston*, 735 F.2d 1555, 1566 (5th Cir.1984) (en banc) *petition for cert. filed*, 53 U.S.L.W. 3509 (U.S. Dec. 14, 1984) (No. 84–951).[22]

Although the evidence is weak on the question of intent, we think it sufficient to create a genuine issue of material fact. Woznick had discussed, however briefly, a statewide bid with a Savin official, and Andreff, with his prior experience in bidding statewide contracts, clearly came to Jayco with the intent of expanding Jayco's business into statewide contracts. The district court concluded, however, and we agree, that Jayco failed to demonstrate the requisite preparedness to undertake the rental and servicing of statewide contracts.

The courts have looked to several factors in assessing a company's preparedness to expand. These factors include

the ability of plaintiff to finance the business and to purchase the necessary facilities and equipment; the consumation of contracts by the plaintiff; affirmative ac-

tion by plaintiff to enter the business; and the background and experience of plaintiff in the prospective business.

*Martin*, 365 F.2d at 634 (citations omitted). Because Savin's refusal to supply machines is the gravamen of Jayco's complaint, the fact that Jayco could not have acquired the machines from Savin even had it satisfied all of the above elements is not dispositive. Rather, the question is whether, assuming Savin had been willing to supply Jayco with the necessary machines, Jayco would have been prepared to bid them.

As discussed below, Woznick's own statements and Jayco's failure to show that it could have financed the purchase of the machines convince us that Jayco lacked the preparedness to bid. This analysis, however, extends only to Jayco's planned expansion of its business into statewide bidding; it does not concern Jayco's standing to pursue relief for damages to its ongoing, normal course of business, which would have included the open market rental or sale of copiers and supplies. However, for other reasons set out below, we find that Jayco also lacks standing to challenge Savin's alleged price-fixing violations and Savin's restraints on the bidding of supplies. We turn first to the question of Jayco's preparedness to bid in 1976.

In July, 1976, Woznick had written Savin that Jayco was "not in a position to rent 750 copiers—even if were able to obtain ample machines."[23] Later that summer when Savin met with its dealers to discuss the administration of the state contract,

---

**21.** This inquiry is to be distinguished from the question of assessing damages. If the plaintiff can show injury to business or property, difficulty in computing damages is no bar to standing. *Zenith Radio Corporation v. Hazeltine Research, Inc.*, 395 U.S. 100, 123–25, 89 S.Ct. 1562, 1576–78, 23 L.Ed.2d 129; *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 164–65, 66 S.Ct. 574, 579–80,90 L.Ed. 652 (1946).

**22.** *Affiliated* involved Affiliated's attempt to obtain Houston's cable TV franchise. A § 1 conspiracy frustrated the attempt. Although the court did not explicitly require a showing of success, its holding implicitly required a showing that Affiliated "would have obtained a fran-

chise on the merits of its application." *Id.* Because Jayco never even submitted a bid, such a determination would be impossible in this case; we would require only that Jayco show a high likelihood of success.

However, because Jayco has failed to show its preparedness to bid, we do not consider whether Jayco had a high likelihood of success. We note that factors relevant to such a determination would be those used by the State Purchasing Commission at the time a bid would have been submitted. Thus, testimony from the officials that would have assessed plaintiff's qualifications would be essential.

**23.** See note 19 *supra.*

Woznick told Savin that Jayco had all the business it could handle.[24] Counsel's characterization of this latter statement as a "white lie"—designed apparently to prevent Woznick's having to disclose his embarrassing legal and moral objections to his business associate—does not rise to "significant evidence demonstrating the existence of a genuine fact issue." Woznick's earlier statement in his letter tends to support the conclusion that he later meant what he said. Moreover, the complete lack of any antitrust claims in Jayco's original complaint tends to belie Woznick's *post hoc* assertion that he found Savin's plans legally objectionable.

Jayco relies on the affidavit of Collene Collins, a former senior vice-president at Mercantile Dallas Bank, to demonstrate Jayco's financial preparedness to expand. Having stated that she had examined the creditworthiness of Jayco and the Woznicks and the profit history of the state contracts, she concluded that "under these assumptions and circumstances I would have enjoyed the opportunity to have extended the necessary credit to Jayco Systems, Inc., and to have played some part in what would have been a very successful undertaking." [25]

Mindful of the admonition that the "mere possibility of financing being available in the abstract is not enough," *Hayes v. Solomon*, 597 F.2d at 975, we scrutinize Ms. Collins' affidavit carefully, note that her statements have not been subjected to the curative process of cross-examination, and find that her affidavit does not, in the face of Woznick's own declarations, rise to the level of a showing of *"significant evidence demonstrating the existence of a genuine fact issue"* regarding preparedness.

First, there is no evidence that Ms. Collins considered the fact that the contracts did not guarantee the placement of copiers with the state agencies. Counsel conceded at oral argument that without adequate marketing of the machines after the bid, there was no guarantee that the machines could be placed.[26] Moreover, the contract permitted the return of machines on thirty days notice. Second, her conclusion that Jayco's and the Woznick's creditworthiness in 1976 was "excellent" indicates that she did not consider Jayco's repayment history with Canon or Savin, which had been described at the time only as "good" and "generally satisfactory." [27] Finally, the fact that Ms. Collins seems to have based her conclusion in part on the profitable history of the contract—information that would have been unavailable to any banker at the time and that rests in all probability on Savin's own efforts—taints her testimony.

In addition, at no time did anyone from Jayco approach anyone about financing the purchase of the necessary machines.[28] While this fact is not in itself dispositive— any efforts subsequent to Savin's refusal to deal would have been in vain, and efforts prior to its refusal would have been speculative—it buttresses our conclusion that Jayco has failed to show that it was able

---

**24.** See note 12 *supra*.

**25.** Rec. at 1531.

**26.** Counsel for Jayco noted:
In other words, if there was no marketing done, if there were no sales done, there could conceivably be no machines placed. As a matter of practice though, rather than exception, most agencies would use whatever the contract machine was because there was supposed to be a competitive bid, and the agency should feel that the lowest available price for the particular product had been achieved through that bidding process.

**27.** Depo. of Bishop, "OO," Ex. 22.

**28.** The only occasion on which anyone from Jayco approached a banker regarding a loan occurred when Jerry Andreff attempted to borrow $86,000 for the purpose of acquiring Jayco from Woznick. The banker declined the request because of the condition of the company. While the banker, of course, did not consider the application in light of a request to finance the purchase of copier machines for statewide bidding—which would have required initial financing of over $400,000—we find it not insignificant that the condition of Jayco was insufficient to guarantee a loan of $86,000. Depo. of Bishop, "OO".

and prepared to obtain financing in 1976.[29] Jayco therefore lacks standing to challenge Savin's refusal to supply machines for a statewide bid.

■ Because Savin's use of Unicopy and Trent Fowler to set its bid price did not injure Jayco, Jayco lacks standing to challenge this alleged price-fixing.[30] For the reasons set forth in Part IV below, we conclude that Jayco has failed to show that its exclusion from the State of Texas copier business violated the rule of reason. Because its exclusion was not unlawful, its position with regard to any subsequent price-fixing or bid rigging, if any, was no different than that of the average person on the street. Unlike a competing bidder or a defrauded purchaser, Jayco did not as a matter of law suffer any injury to its business or property.

We turn next to Jayco's allegations regarding resale price maintenance. First, nothing in the record supports a finding of resale price maintenance in the sale or rental of copiers. Because Savin refused to allow any of its dealers to bid copiers to the State in the first place, Savin had no need to maintain resale prices.[31]

The supply bid in 1976, in which Savin gave three dealers special discounts[32] presents a different problem. While Savin's requirement that three dealers bid the supplies at a set price arguably makes out a case of resale price maintenance, Jayco has no standing to challenge the violation because Jayco did not bid on supplies in 1976 and there is no evidence that Savin prevented Jayco from bidding for the 1976 supplies. Any injury from the alleged violation was therefore not Jayco's. The same can be said of Jayco's complaint that Savin prevented its dealers from selling other manufacturers' toner and dispersant. Jayco points to no instance where it attempted to bid a non-Savin TD pack. Jayco simply seeks here to recover for someone else's injury. Without injury, Jayco does not have standing.

## III. PER SE OR RULE OF REASON?

■ We are left therefore only with Jayco's claim that through territorial and customer divisions and a group boycott, Savin combined to restrain trade in the sale and rental of copiers in violation of § 1 of the Sherman Act.[33] Because every contract or business combination in some sense re-

---

**29.** This case is remarkably similar to *Martin v. Phillips Petroleum*, where the court found that Martin, whose attempt to purchase a gas plant had been frustrated, had not been injured in his business within the meaning of 15 U.S.C. § 15. The court noted:

> [W]e find that appellant by his own admission had no experience in the operation of a gas plant. He did not have the ability to finance the business, but was hoping to obtain 100% financing from the Bank. He made no investment in facilities or equipment. He had no contract with the bank.... Thus, it seems plain that Martin was unprepared to either enter the new business or to expand his existing business to include the gasoline plant purchase and operation.

365 F.2d at 634.

**30.** Savin vigorously protests that Jayco released any claim of conspiracy involving state officials. The Compromise and Settlement Agreement reserved to Jayco the right to pursue its § 1 and § 2 claims as set forth in its Fourth Amended complaint. Savin points to the following language in the complaint—"Savin and its independent dealers ... entered into a combination, or conspiracy ...,"—and argues that the omission

of any explicit reference to state officials precludes Jayco from using their acts as the basis of a conspiracy. We disagree. Jayco need not name every conspirator when it pleads conspiracy. Moreover, after a review of the record, we doubt if the references to state officials caused Savin any undue surprise.

**31.** Had Savin not refused to sell machines to its dealers and required that they bid not higher or lower than a predetermined price, this tale might have had a different ending.

**32.** Any complaint regarding the discounts on supplies that Savin gave the three dealers is a claim under the price discrimination provisions of the Robinson-Patman Act, 15 U.S.C. §§ 13, 13a. Jayco has released such claims.

**33.** Section 1 provides: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states, or with foreign nations, is declared to be illegal...." 15 U.S.C. § 1.

strains trade, a rule of reason [34] that examines the restraint's impact on competition has generally been the arbiter of conduct alleged to violate § 1. *Standard Oil Co. v. United States*, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911); *National Society of Professional Engineers v. United States*, 435 U.S. 679, 98 S.Ct. 1355, 1363, 55 L.Ed.2d 637 (1978).

While the rule of reason requires the plaintiff to jump through several hoops and allows the defendant ample opportunity to wriggle off the hook, the courts, through long experience, have classified several categories of practices as illegal *per se. Per se* violations are those "which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." *Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 2557, 53 L.Ed.2d 568 (1977), *quoting Northern Pac. R. Co. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958).

Price fixing,[35] resale price maintenance,[36] group boycotts,[37] tying arrangements,[38] and certain types of reciprocal dealing [39] have all received *per se* treatment. As we have previously recognized, "[t]he *per se* rule is the trump card of antitrust law. When an antitrust plaintiff successfully plays it, he need only tally his score. Properly applied, the *per se* rule is 'a valid and useful tool of antitrust enforcement.'"

*United States v. Realty Multi-List, Inc.*, 629 F.2d 1351 (5th Cir.1980) (citation omitted).

Whether or not a combination or conspiracy falls under the *per se* rule often depends upon whether the restriction is implemented by a vertical or horizontal agreement. *See, e.g., Red Diamond Supply, Inc. v. Liquid Carbonic Corp.*, 637 F.2d 1001, 1004 (5th Cir.1981) (first step of analysis is to determine whether alleged conspiracy is vertical or horizontal).[40] Horizontal agreements affect *inter* brand competition, and because interbrand competition is "the primary concern of antitrust law," they are generally illegal *per se. Sylvania*, 97 S.Ct. at 2558 n. 19, 2561 n. 28. Vertical agreements, on the other hand, generally affect *intra* brand competition. Because interbrand competition can act as a check on intrabrand restrictions, *Sylvania* at 2558 n. 19, and because intrabrand restrictions in turn can increase interbrand competition in several ways, *id.* at 2560, vertical agreements are generally considered not so pernicious as to warrant *per se* treatment.

A notable exception to this general rule is resale price maintenance. *United States v. Parke, Davis & Co.*, 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960); *Greene v. General Foods Corporation*, 517 F.2d 635 (5th Cir.1975), *cert. denied*, 424 U.S. 942, 96 S.Ct. 1409, 47 L.Ed.2d 348. Another exception is one where the supplier, although acting vertically, refuses to deal with or acts to terminate a customer at the behest

---

**34.** The most frequently cited statement of the rule is that of Justice Brandeis in *Chicago Board of Trade v. U.S.*, 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918).

**35.** *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940).

**36.** *Dr. Miles Medical Co. v. John D. Park & Sons, Co.*, 220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502 (1911).

**37.** *Klors, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959).

**38.** *International Salt Co. v. United States*, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20 (1947).

**39.** *United States v. Griffith*, 334 U.S. 100, 68 S.Ct. 941, 92 L.Ed. 1236 (1948).

**40.** "Vertical agreements are those among persons at different levels of the market structure—i.e., among a manufacturer and its distributors—in contra-distinction to horizontal agreements among competitors at the same level of the market structure—i.e., among manufacturers or distributors." *Graphic Products Distributors v. Itek Corporation*, 717 F.2d 1560, 1565 n. 3 (11th Cir.1983) (quoting ABA Antitrust Section Monograph No. 2 (1977)).

of the customer's competitor. "[A]lthough the termination in such a situation is, itself, a vertical restraint, the desired impact is horizontal and on the dealer, not the manufacturer level." *Cernuto, Inc. v. United Cabinet Corp.*, 595 F.2d 164, 168 (3rd Cir. 1979); *see also Abadir & Co. v. First Mississippi Corp.*, 651 F.2d 422, 427 n. 5 (5th Cir.1981); *Red Diamond Supply, Inc. v. Liquid Carbonic Corp., supra*, 637 F.2d at 1004 n. 4 (5th Cir.1981) (discussing the importance of the source—manufacturer or distributor—of the restraint).

■ Against this background, nothing in the record suggests a conclusion other than that the agreements dividing up territories for servicing and placement of copiers between Savin and its dealers were vertical in nature and purpose. From 1976 to 1981, Savin steadfastly refused to permit any dealer but Unicopy to submit bids on the State copier contracts or open market sales. Even then, Unicopy appears to have acted only as Savin's agent for submitting bids. There is not the slightest hint that any part of Savin's scheme to distribute either copiers, service, or supplies originated as one or more dealers' attempt to injure a competitor.

Looking to *Red Diamond Supply, Inc. v. Liquid Carbonic Corp.*, we need do no more than substitute "Savin" for "Liquid" to conclude: "Since the allegation here is that [Savin] imposed an agreement upon its distributors to abide by territorial and customer restrictions, that agreement is a vertical one, and the restrictions imposed are

vertical restrictions." 637 F.2d at 1004. These restrictions are therefore measured against the rule of reason. *A fortiori*, Savin's threats to terminate any dealer that did not abide by that agreement—i.e., those dealers who "rocked the boat"—are also measured against the rule of reason. *GTE Sylvania, supra.*[41] We turn now to Jayco's § 1 claim under the rule of reason, and to its § 2 claim.

## IV. IN SEARCH OF THE RELEVANT MARKET

■ Section 2 of the Sherman Act, 15 U.S.C. § 2, provides in relevant part: "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of trade or commerce among the States ... shall be deemed guilty of a felony." In *United States v. Grinnell Corp.*, 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966), the court fleshed out the statute a bit and explained: "The offense of monopoly under § 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Id.* at 570–71, 86 S.Ct. at 1704, *quoted in Aspen Skiing Company v. Aspen Highlands Skiing Corporation*, —— U.S. ——,105 S.Ct. 2847, 2854 n. 19, 86 L.Ed.2d 467 (1985).

**41.** Jayco's half-hearted attempt to characterize Savin's refusal to deal as a group boycott and thereby bring it within the ambit of *per se* condemnation, *Mendelovitz v. Adolph Coors Co.*, 693 F.2d 570, 577 (5th Cir.1972), is unavailing. Simply put, the facts do not support a finding of a group boycott. In fact, Jayco was offered the opportunity to participate in the service network, but declined to do so. As one commentator has observed, "boycott law deals with concerted efforts by traders at one level to keep others out or inhibit their competitive efforts at that level by making it more difficult for them to find what traders at that level need, usually suppliers or customers but sometimes access to transactions with other traders at the same level. When concerted conduct entails these ele-

ments, the boycott rule may have application." L. Sullivan, Antitrust § 83, at 232 (1977).

The only set of facts that might justify a preliminary finding of group boycott would be that where Unicopy, alone or with other dealers, conspired with Savin to deny Jayco copiers or supplies. *See, e.g., Klor's, Inc. v. Broadway Hale Stores, Inc.*, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959) (department store conspired with wholesalers and manufacturers to deny competing store the goods it needed to do business). Because there is no evidence that any dealer influenced Savin's refusal to deal or that anybody other than Savin refused to deal with Jayco—and that refusal extended only to enforcing its customer restriction—this set of facts remains hypothetical.

These elements can be subdivided further, and the subelement of most importance to the disposition of Jayco's remaining claims is that involving the relevant market. This element is essential in both attempt and monopolization cases. *Spectrofuge Corporation v. Beckman Instruments, Inc.*, 575 F.2d 256, 276 (5th Cir. 1978), *cert. denied,* 440 U.S. 939, 99 S.Ct. 1289, 59 L.Ed.2d 499. "Because the relevant market provides the framework against which economic power can be measured, defining the product and geographic markets is a threshold requirement under § 2." *Id.* In addition, a showing of a relevant market is also necessary to assess anticompetitive effects in rule of reason analysis under § 1. *Sports Center, Inc. v. Riddell, Inc.*, 673 F.2d 786, 790–91 (5th Cir.1982); *Muenster Butane, Inc. v. Stewart Co.*, 651 F.2d 292, 295 (5th Cir.1981).

In *Brown Shoe Co. v. United States,* 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962), the Court set out broad guidelines to help determine the product market or submarket, if any:

> The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it. However, within this broad market, well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes. The boundaries of such a submarket may be determined by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors.

*Id.* at 325, 82 S.Ct. at 1523–24 (citations omitted).

Jayco defines the relevant product market as "low and medium volume copiers." Other than Jayco's expert's reference to the "convenience copier market," [42] there is no evidence in the record that would help us assess Jayco's definition against the *Brown Shoe* guidelines, nor is there any evidence in the record that would help us decide whether the product market should be limited to low and medium volume copiers or expanded to include high volume copiers as well.

Even assuming that such evidence, if offered, would have shown a low cross-elasticity of demand, i.e., a low degree of substitution between low and medium volume copiers on the one hand and high volume copiers on the other, Jayco has failed to show a relevant geographic market. While Jayco claims that the relevant geographic market is the Texas State government copier business, it has offered during the lengthy history of this case not a shred of evidence why the market should be so artificially limited to a single purchaser.[43]

"While the relevant competitive market is not ordinarily susceptible to a metes and bounds definition," the Supreme Court has noted as a general proposition that it is the area in which the suppliers of a product "effectively compete." *Tampa Electric Company v. Nashville Coal Company,* 365 U.S. 320, 331–32, 81 S.Ct. 623, 630, 5 L.Ed.2d 580 (1961). The area of effective competition, as one commentator helps us conclude, is measured by the "ability of firms to sell beyond their immediate locations." [44] This ability is influenced by such factors as transport costs, price relation-

---

**42.** Depo. of Hunt, "LL" at 79.

**43.** While the question of relevant market is usually one of fact for the jury, the relevant market may in some instances be determined as a matter of law. *Seidenstein v. National Medical Enterprises, Inc.,* 769 F.2d 1100, 1106 (5th Cir.1985). As the court in *Seidenstein* noted, "absent exceptional market conditions, one brand in a market of competing brands cannot constitute a relevant product market." *Id.* Similarly, one purchaser in a market of competing purchasers cannot constitute a relevant geographic market, absent exceptional market conditions.

**44.** 2 P. Areeda & D. Turner, Antitrust Law § 522, at 355 (1978).

ships and actual sales patterns in the area, and buyer convenience and preferences.[45]

Even without an analysis of these factors, we can conclude that by choosing the state government contract business as the relevant market, Jayco has in effect conceded that its market definition is too narrow. If the state government, with its offices and agencies across the state, constitutes the relevant market, Jayco's exclusion from the market of all other purchasers within the state is completely arbitrary. Jayco asks us to limit arbitrarily the geographic market to a single purchaser, a limitation that, because of Savin's large share of the government's business, would allow Jayco to assume what it must prove. As a matter of common sense a single purchaser of a product cannot generally be considered a relevant market, lest we wish to clothe each and every sale with an antitrust suit.[46]

Recognizing this, Jayco directs our attention to two cases in which governmental bodies have themselves formed the relevant markets. In *Grumman Corporation v. LTV Corporation,* 527 F.Supp. 86 (D.C. N.Y.) *aff'd* 665 F.2d 10 (2nd Cir.1981), the district court found that the United States Government constituted the relevant market for the sales of carrier-based aircraft and equipment. This result rested largely on the fact that the United States was the sole purchaser of the military equipment involved.[47] By contrast, the Texas State government is but one of many users of copiers in Dallas, not to mention Texas or the United States in general. We find *Grumman* inapplicable to this case.

In *Affiliated Capital Corporation v. City of Houston,* 735 F.2d 1555 (5th Cir. 1984) (en banc), this circuit found that an agreement among Houston businessmen to divide, with the blessing of the mayor, the city among themselves to ensure the receipt of cable television franchises constituted a conspiracy in violation of § 1 of the Sherman Act. As the dissent in that case points out, the court made no determination of the relevant market, so we must assume that the relevant market was the City of Houston. To say this, however, provides no support for Jayco's argument in this case. Unlike the state government's position as merely one of many purchasers of copiers within the state, the City of Houston stood alone as the sole franchisor within its jurisdiction. Whatever further distinctions could be drawn between the city's role as franchisor and the state's role as purchaser, we think it sufficient to distinguish the case based on the City of Houston's unique position within a distinct geographic area.

Because Jayco has failed to show a relevant market against which Savin's market power and the anticompetitive effects of its practices can be judged, we dismiss Jayco's § 2 claim and its remaining § 1 claims.[48]

---

**45.** *See generally, id.* §§ 522–525.

**46.** We hazard the suggestion that a single purchaser could not be considered a relevant market unless plaintiff made some showing of the purchaser's monopsony power.

**47.** In arriving at a definition of the relevant product submarket, the district court in *Grumman* noted:

The United States Government *is the market* concerned with production and distribution of weapons systems for government military establishments. As such, this differs from the basic thrust of antitrust laws applicable to governmental procurement practices in competition with consumer enterprises buying goods generally available in the marketplace. 527 F.Supp. at 90, *quoting Northrop v. McDonnell Douglas Corp.,* 498 F.Supp. 1112, 1123 (C.D. Cal.1980) (emphasis in original).

**48.** If we assume that the whole state was the relevant market (something that Jayco has never even contended), Jayco has shown neither Savin's market power nor an anticompetitive effect on interbrand competition in either the copier or supplies product market. In fact, from reading Jayco's briefs, one gets the impression, unsupported by any meaningful data, that Savin was the only major supplier of copiers in Texas. While this might have been true, the record does not disclose to us the fate of IBM, Xerox, Canon, Saxon, A.B. Dick, Sharp, Minolta, and the other manufacturers. Jayco has the burden of proving anticompetitive effect, *Red Diamond,* 637 F.2d at 1007, and it has failed to carry it.

## IV. CONCLUSION

While Jayco has been nothing less than intrepid in its quest for the°grail of treble damages, we find that its search, like that of its medieval counterparts, has been in vain. Accordingly, we affirm the judgment of the district court.