JONES, Circuit Judge,
dissenting.
My colleagues view of this case is well articulated, and I am pleased to concur in most of the opinion. I respectfully disagree, however, with their resolution of Sanger’s antitrust standing, an issue predicate to its assertion of Texas antitrust claims. The record, and indeed my colleagues’ own analysis, demonstrates without factual dispute that Sanger was not actually prepared to enter the market' for handling group insurance coverage of veterinary physicians’ practices. Such lack of preparedness indicates, as our previous cases have held, that Sanger suffered no injury if it was barred from entering that market. Jayco Sys., Inc. v. Savin Bus. Machs. Corp., 777 F.2d 306, 313 (5th Cir.1985). This dissent is not about the applicable law, but about the application of law to the facts. Courts cannot allow the powerful medicine of antitrust law, powerful not only because a plaintiff can receive treble damages and attorneys’ fees for proving a violation but also because the extraordinary costs of preparation and trial can force settlements in meritless cases, to benefit wannabes who file suit before they have made a credible investment in competing. The purpose of antitrust law is to benefit competition, not competitors. A lax approach to antitrust standing works at cross-purposes with the substantive law.
The applicable law of antitrust standing has long been settled in this court. Factors which indicate that a plaintiff is pre *750 pared to compete include: “the ability of the plaintiff to finance the business and to purchase the necessary facilities and equipment; the consummation of contracts by the plaintiff; affirmative action by plaintiff to enter the business; and the background and experience of plaintiff in the prospective business.” Jayco, 777 F.2d at 314 (quoting Martin v. Phillips Petroleum Co., 365 F.2d 629, 634 (5th Cir.1966)). Even if all these factors are satisfied, however, the ultimate question is whether a plaintiff would have been prepared to sell the policies to a group of veterinarians through a state association even if Zurich, Hartford, CNA, and Travelers were willing to supply them. Jayco, 777 F.2d at 314. This analysis begins with the scope of Sanger’s competitive intentions, adds dimension to the majority’s description of what Sanger had to do to realize its intentions, and demonstrates why Sanger had not positioned itself actually to compete in the group coverage market.
Sanger describes its intentions confusingly, but the majority’s generous synthesis is that the plaintiff does not seek to supplant HUB in the AVMA. Program; instead, Sanger wants to be unimpeded in working with insurers to offer group insurance to members of other veterinary associations. Sanger also claims that it was prevented from entering this market nationwide, but there is no evidence to support that proposition. Even the majority notes that, “because the evidence of Sanger’s preparedness to enter the market that we found sufficient to confer standing primarily involved activity in Texas ... we doubt that the allegations are sufficient to allege injury in other states’ markets.” Based on the record, Sanger’s preparedness for group coverage manifested nearly exclusively in Texas through its attempts to secure “endorsement” from the Texas Equine Veterinary Association.[1]
The majority’s standing discussion hinges on its conclusion that unlike in this court’s previous cases, the obstacles to Sanger becoming a competitor were related to HUB’s alleged anticompetitive conduct rather than to Sanger’s deficiencies. In other words, but for HUB’s having allegedly locked up the market for several different types of group veterinary practice coverage, Sanger could have sold its “product” to TEVA and other groups.
To know what Sanger had to do to compete, we must know what HUB did. According to the majority, HUB’s role in both managing the Professional Liability Insurance Trust for AVMA and serving as the insurance broker included promotion, marketing, servicing insureds, monitoring claims, developing policy forms, and negotiating rates. Further, to assist PLIT in negotiating terms of coverage on AVMA’s behalf, HUB gathered and analyzed claims data, and HUB assisted in developing rate structures for submission to various state insurance regulatory agencies. During the period in question, the AVMA PLIT offered policies for professional liability, employer’s practice liability, property and general liability, and workers’ comp. As the majority explains in its McCarran-Ferguson Act discussion, the “business of insurance” fundamentally relies for affordability on scale and the spreading of risk among insureds. HUB was negotiating the spreading of risk for presumably thousands of AVMA members who opted for the group insurance, thus maximizing the potential economies of scale. Concomitantly, it had to be performing the related tasks for thousands of members.
*751 What had Sanger done to compete in the procuring and servicing of group insurance coverage? It “had an idea and an intent to execute,” as the district court found. It had engaged in discussions with over twenty insurers and with veterinarians and TEVA about prospects for its venture. It became a sponsor for a few thousand dollars at two TEVA conferences. It had sold coverages to about twelve veterinary practices, generating about $59,000 in new business. Its “owners had relevant experience as an insurance specialist, an equine veterinarian, and a lawyer who had operated Sanger and sold insurance in a number of states.” The majority reviews this evidence in the light most favorable to the non-movant for summary judgment, but these tidbits pale in comparison to the nature and requirements of the business it sought to enter.
First, none of the “relevant experience” had to do with the negotiating and servicing of group coverage of multiple types of insurance. Dr. Donnell may be a renowned equine vet, but this alone does not qualify him as an insurance broker for veterinary practices. Jim Bear had been involved in the insurance of farm and ranch businesses, but the terms of insurance coverage for those risks are markedly different from those for medical professionals. Further, Bear worked only 15-20 hours weekly as’ the insurance “expert” in Sanger’s insurance business, while he continued to manage Dr. Donnell’s medical practice. Attorney Springer and his wife purchased Sanger in 2007 and had operated it for only four years with a small staff. No evidence is offered that Sanger had ever engaged in handling group coverages, in negotiating prices based on the group risk characteristics, or servicing the volume of insureds that alone could provide sufficient risk-spreading to generate competitively attractive costs of coverage.
Second, the majority notes that insurance brokerage is not as capital intensive as other businesses in which this court has found plaintiffs unprepared to enter (and sue for antitrust violations). I agree, but there is no affirmative evidence of any significant investment beyond the $196,500 apiece paid by Dr. Donnell and Mr. Bear to buy into the Sanger agency, plus the cost of appearing at the TEVA conferences. Let us assume, optimistically, that Sanger’s transformation into a HUB-like provider of group insurance and related services to an organization like TEVA (300 members) required no more than adding personnel — rather than heavy capital investment. Nevertheless, hiring and retaining a staff of qualified personnel to handle volume marketing, premium payments for hundreds of new policyholders, underwriting, renegotiating coverages periodically, and'monitoring elaims-handling entails fiscal as well as managerial challenges. Yet Bear spent half his working hours away from the agency, Dr. Donnell maintained his full-time veterinary practice, and the plaintiffs acknowledge they never made a business plan.
Third, I disagree with the majority’s breezy assertion that “[t]he primary challenge in the middleman business of brokering is not capital but relationships,” such that Sanger was prevented by HUB’s alleged exclusive contracts with insurers from “leveraging its relationships” to offer policies. The primary challenge, in my view, was Sanger’s demonstrating the competence to sell and service a competitively priced specialty insurance package to groups of medical professionals. “Relationships” go only so far in assuring either the insurers or its customers, whether the entire group or individual members, that Sanger would offer quality service on all levels. The significance of this challenge is reflected in the fact that neither HUB nor the insurers HUB dealt with enjoyed *752 long-term contractual relationships. HUB worked for AVMA PLIT under nonexclusive two-year contracts, while the alleged “exclusive” agreements between HUB and the insurers lasted only a couple of years on average. The flexibility inherent in these arrangements sdggests that price and service, far more than “relationr ships,” govern success in HUB’S business. Sanger had little more than “relationships,” even discounting the availability of coverage, to reassure a group like TEVA that its ongoing level of service would be competitive.
Finally, that HUB viewed Sanger as a “threat” should be irrelevant to the question of Sanger’s preparedness to enter the market for group veterinary practice insurance policies. The majority spends only one paragraph on this point, citing no case law in support, and rightly so. A competitor’s outside perception of another entity’s appearance in the marketplace has nothing to do with the issue at hand, which is whether this plaintiff has demonstrated its actual preparation and ability to enter the market such that but-for the defendant’s conduct, it would have succeeded. Allowing a defendant’s perception to support a finding of a plaintiffs standing to sue for antitrust violations is a circular argument.
For all these record-based reasons I would have denied Sanger standing to sue under the Texas antitrust laws. I respectfully dissent.

. The majority's hedging on Sanger’s preparedness to enter other markets affords the possibility that, on remand, standing can be summarily denied vis a vis markets outside Texas.