GAS UTILITIES COMPANY
OF ALABAMA, INC.

v.

SOUTHERN NATURAL GAS COMPANY
and Alabama Gas Corporation.

No. CV–91–PT–00445–S.

United States District Court,
N.D. Alabama, S.D.

Aug. 12, 1992.

Maston E. Martin, Jr., Hardin Tucker & Martin, Birmingham, AL, Fitz Barnett, Glickman & Barnett, Houston, TX, for plaintiff.

Thomas W. Thagard, III, Lee E. Bains, Jr., & George G. Lynn, Maynard Cooper Frierson & Gale, Birmingham, AL, Carl Alan Roth, John A. Donovan and Stephen J. McConnell, Skadden Arps Slate Meacher & Flom, Los Angeles, CA, for Southern Natural Gas Co.

Philip Joseph Carroll, III, and Joseph B. Mays, Jr., Bradley Arant Rose & White, Birmingham, AL, for Alabama Gas Corp.

## MEMORANDUM OPINION

PROPST, District Judge.

Plaintiff Gas Utilities Company of Alabama (GUA) filed this suit against Southern Natural Gas Company (Southern) and Alabama Gas Corporation (Alagasco) alleging violations of the Sherman Antitrust Act as well as tortious interference with business relations. Pending before the court are defendants' motions for summary judgment filed on February 28 and deemed submitted on May 18, 1992.

## FACTS

The following is a summary of the undisputed facts in this case. Defendant Southern owns and operates an interstate pipeline for natural gas which runs from Texas through Alabama to South Carolina. The company sells and transports the gas to local distribution companies (LDC) which distribute gas to individual customers as well as to industrial end users.[1]

Defendant Alagasco is a local gas distribution company that provides natural gas service at retail to residential, commercial and industrial customers in Alabama. Alagasco obtains its gas from three sources. Southern is its principal supplier of natural gas. Alagasco also receives a portion of its gas supply from Transcontinental Gas Pipe Line Corporation ("Transco"). A portion of Alagasco's supply consists of gas produced in Alabama.

Plaintiff GUA is an Alabama corporation formed by Dan Tutcher and Ray Levier in 1989. Mr. Tutcher is president, secretary and treasurer of Midcoast Natural Gas, which engages in the business of natural gas pipelining and marketing. Tutcher Deposition at 22. Mr. Levrier is employed by Midcoast Marketing and REL Resources, Inc., which trades in heavy fuel oil as well as natural gas marketing. Levrier Deposition at 6–8. Tutcher and Levrier formed Gas Utilities to solicit direct connections between Magnolia interstate pipeline and industrial end users in Central Alabama. Tutcher Dep. at 57. The record does not specify when GUA made the decision to solicit direct connections between Southern's interstate pipeline and industrial end users. Essentially, GUA would function as an intrastate pipeline company which would build alternative pipelines to service industrial customers, including those of Alagasco, in Central Alabama. GUA's pipelines would lead directly from Southern's interstate pipeline to industrial customers. According to Tutcher, GUA sought to undercut the rates charged by LDC's such as Alagasco to industrial customers. Tutcher Deposition at 66.

The following facts are disputed by the parties. Tutcher and Levrier claim that, prior to forming their company, they performed a market study and personally contacted approximately forty potential customers to survey the market for the natural gas they expected to offer. Affidavit of Dan Tutcher at 3. The company then obtained two contracts with Gurney Industries and Tuscaloosa Steel. *Id.* Plaintiff asserts that GUA then attempted to secure two taps from Southern to service these potential clients. *See* Letter from Dan Tutcher to Mark Limbaugh, Manager, Market Development, Southern Natural Gas Co., November 16, 1989 and December 14, 1989. Mr. Tutcher claims that, in both cases, Southern referred to a company policy which prevented it from granting the taps to GUA. Plaintiff's Response at 3. Southern's letter to Tutcher indicated, however, that GUA should contact it if GUA decided to modify its request to provide for the use of an existing delivery point in the Tuscaloosa area. Letter from Mark Limbaugh to Dan Tutcher, December 5, 1989. GUA submitted a total of three

---

1. Southern's Brief in Support of its Motion for Summary Judgment at 3. In its brief, Southern maintains that it has not directly connected any end user within the past twenty years.

requests for construction of new taps to Southern.

Southern acknowledges that it has denied the taps to GUA and has set forth its rationale for denying the use of the taps to GUA. Essentially, Southern asserts that the construction of new taps to allow industrial end users of gas to bypass [2] LDC customers such as Alagasco is not in the company's business interest for two reasons. First, Southern claims that construction of new taps could result in its losing recovery of "take or pay" costs.[3] Further, Southern asserts it cannot be held liable under the antitrust laws for this settlement because it was authorized by FERC a federal regulatory agency. In support of this contention, Southern points to *Williams Elec. Co. Inc. v. Honeywell, Inc.*, 772 F.Supp. 1225, 1229 (N.D.Fla.1991) in which the court held that "private parties are shielded from federal antitrust liability where their actions were regulated by a federal regulatory agency acting pursuant to congressional authority." *See also Medical Ass'n v. Schweiker*, 554 F.Supp. 955, 966 (M.D.Ala.1983), *aff'd per curiam, Medical Ass'n v. Heckler*, 714 F.2d 107, 108 (11th Cir.1983) ("private parties, to the extent they are acting at the direction or with the consent of federal agencies also fall outside the pale of the [Sherman] act's prohibition.")

Second, Southern asserts that it had reason to believe that the residential and commercial markets for natural gas would be eroded if it allowed industrial customers to bypass the LDC's. Specifically, Southern was concerned that LDC's such as Alagasco would need to raise their rates to commercial and residential consumers to recover costs from a smaller customer base. This, in turn, could result in an overall decrease in demand for residential gas.[4] In addition, Southern asserts that prices charged to industrial customers were used to subsidize residential and commercial customers. To avoid such a decrease, Southern claims that it unilaterally adopted a policy in 1988 that it would construct new delivery points for industrial end users only if the end user's load could not be served through an existing delivery point and if Southern had concluded that construction of such a new delivery point would be in Southern's best interests. Major Deposition at 111–112; Limbaugh Deposition at 11.[5] Southern claims that, pursuant to this policy, it rejected GUA's requests for delivery points to be constructed, since all end-users which GUA had identified could be served through existing Southern delivery points which were already connected to Alagasco's system. Southern's Brief at 11. Southern asserts that it did not consult with Alagasco regarding this decision to deny GUA the taps and denies that Alagasco played any role in this decision.

GUA asserts that after Southern had denied it the new taps, a representative of Southern suggested to Tutcher that he contact Hunt Refining to request that Hunt permit GUA to use the tap that interconnected with Southern. After being contacted by Tutcher, Hunt responded that it could not do so without consulting with Alagasco. Alagasco subsequently refused to grant this permis-

---

**2.** The term "bypass" refers to the construction of a pipeline to connect an industrial customer directly to an interstate pipeline without using the facilities of the industrial customer's LDC. Major Deposition at 160.

**3.** "Take or pay" provisions in long term gas supply contracts require Southern to pay for gas covered by the contract, whether or not it takes the gas. In 1988, Southern and its LDC customers reached a settlement which permitted Southern to pass a portion of these take or pay costs to customers. This settlement, which was approved by the FERC, contained a term which would permit an LDC such as Alagasco to reduce its share of the take or pay costs in proportion to the amount of any load which the LDC lost to the pipeline in the event of a bypass. Matthews Deposition at 97.

**4.** It was apparently this argument that led to plaintiff's motion for this judge to disqualify himself. The court denied the motion because, regardless of who makes the argument, the potential for some effect on this judge's family's interest is remote. (As a matter of interest, Grace Petroleum has *already* closed its well). Plaintiff's argument has a horseshoe nail and kingdom type theory which was rejected, in another context, in *Holmes v. Securities Investor Protection Corp.*, —— U.S. ——, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992) (Scalia, J., concurring).

**5.** Mr. Limbaugh's deposition indicated that the possibility of incremental business was one factor which Southern considered in determining whether to grant the use of a tap.

sion. Plaintiff's Brief at 45. Deposition of Dan Tutcher at 276–278.

GUA maintains that a representative of Southern has indicated that the company denied the tap to service Tuscaloosa Steel because it did not provide Southern with additional volume. Plaintiff's Response at 14.[6] According to GUA, this reasoning for denying the tap was specious since the gas provided to Tuscaloosa Steel would have meant additional volume transported through Southern's line.[7] Tutcher Deposition at 533–534.

In addition, GUA contends that Southern's fears that it would have to allow all industrial customers to bypass the LDC's, should it grant one bypass, lacks foundation. GUA has not specifically explained the nature of these flaws in Southern's analysis, which it has termed the "death spiral theory" in its briefs. GUA also disputes Southern's presentation of its "bypass policy" argument. According to GUA, Southern prepared an analysis of bypass potential in 1987 in which it allegedly determined that bypass could be beneficial to the company. Plaintiff's Response at 17. Despite this determination, Southern announced a bypass policy which was never committed to writing and which did not mention this 1987 study.[8] In their depositions, company officials stated that Southern would not grant a direct connection unless (1) the tap requested was not capable of being served through an existing delivery point; and (2) it was in the overall business interest of the company to provide the tap. Major deposition at 111.[9] In 1991, Southern adopted a new policy regarding when it would bypass one of its LDC's. This policy, which was committed to writing, provided that Southern would not grant a direct connection for any industrial customer in an area presently served by a resale customer such as Alagasco. Major Deposition at 215–217; Plaintiff's Brief at 23–24.

GUA also discusses Alagasco's attempt to bypass Southern. According to GUA, in 1985 Alagasco allegedly applied for a tap at Transco. Warren Deposition, Volume II at 15–16. Southern intervened in the proceedings before the Alabama Public Service Commission to prevent the issuance to Alagasco of a Certificate of Public Need and Necessity. Major Deposition at 74–80. GUA maintains that Sonat Intrastate, Southern's intrastate affiliate, also reacted to Alagasco's actions by soliciting Alagasco's customers in the Tuscaloosa area to directly connect to them.[10] Alagasco then allegedly reacted by filing a complaint against Sonat Intrastate before the Public Service Commission, alleging that Sonat Intrastate should be subject to the jurisdiction of the Commission. Warren Deposition at 22–25. Both of these complaints were dismissed by mutual agreement. Major Deposition at 84–85.[11]

In its submissions to the court, Alagasco has discussed its response to the competition

---

6. Tutcher wrote to D. Mark Limbaugh, a Southern employee, on December 6, 1989. He stated that he was summarizing Southern's refusal to construct a new delivery point for GUA. The first rationale was the possibility of an economic benefit for Southern. Exhibit 103 to Tutcher's Deposition. While Mr. Limbaugh indicated in his deposition that the potential for increased volume was a consideration used by the company in determining whether to grant a tap, none of the materials furnished by GUA to the court contain a statement to the effect that Southern denied GUA a tap to service industrial end users because such service would not provide Southern with the possibility of transporting increased volume.

7. While Tuscaloosa Steel was a customer of Alagasco, the gas was transported to the mill through the Coronado line shipped through Alagasco's line. Southern had never transported this gas to through its line.

8. William Major, general counsel for Southern, William Matthews, the company's president, and Ron Gardner, allegedly adopted this policy.

9. In its brief, GUA maintains that Major's version of the policy differs from that propounded by Matthews and Gardner. Plaintiff's brief at 19. GUA claims that Major had testified that Southern would not grant a bypass unless there was incremental volume from the direct connection. However, after reviewing Major's deposition, the court concludes that three gentleman presented the same version of the policy.

10. GUA provides no evidence of this.

11. GUA asserts that these actions are indicative of an agreement between Southern and Alagasco. This theory will be discussed more fully, *infra*.

which it perceived GUA posed. According to Alagasco, industrial end users of gas subsidize the service provided to Alagasco's residential and commercial ratepayers. Warren Deposition at 162. Moreover, Alagasco argues that it faces competition for its industrial customers from other sources, including producers of alternative fuels and other providers of natural gas. Memorandum of Law in Support of Defendant Alabama Gas Corporation's Motion for Summary Judgment at 5–6. In light of the importance of its industrial customers, Alagasco claims that the Alabama Public Service Commission has authorized it to use several devices to retain and compete for industrial customers, including a "Special Contract" with an individual customer[12] and a "Competitive Fuel Clause".[13]

Alagasco asserts that it responded to the competitive challenge which it perceived that GUA presented, by using these devices. For example, Alagasco claims that its industrial marketing representatives informed certain industrial customers that Alagasco would remain competitive through the use of the Competitive Fuel Clause or the Special Contract. Wright affidavit. In addition, Alagasco lowered its transportation rates for certain customers after learning that GUA had quoted a price to a customer. These customers include Union Camp Corporation, which operates a paper mill in Prattville; Tuscaloosa Steel, which operates a steel mill in Tuscaloosa; and Phifer Wire Products, which manufactures various wire products at its Tuscaloosa plant. Alagasco claims that if it had known that Southern would deny GUA its taps, it would not have lowered its transportation rates to these customers. J. Hawkins Deposition at 20.[14] Alagasco also offered evidence that it had a policy not to solicit any industrial accounts which were already served by an existing pipeline. J. Hawkins Deposition at 31–37.

GUA's interpretation of Alagasco's actions differ. First, GUA asserts that Alagasco obtained exclusive dealing contracts with customers, which GUA had contacted, which foreclosed future competition from companies such as GUA. Moreover, GUA claims that Alagasco allegedly acted as Union Camp's[15] agent and entered into a more favorable purchase agreement with Southern Marketing, a Southern affiliate. In addition, GUA claims that the chronology of events surrounding Alagasco's reduction of its rates to selected industrial customers suggests that this discounting was a sham to mislead GUA into thinking that the company had acted competitively. According to GUA, Alagasco agreed to reduce its rate to Tuscaloosa Steel on January 2, 1990, after Tuscaloosa Steel had entered into a contract with GUA. GUA claims that Alagasco knew, however, that Southern had denied the taps to GUA before it reduced its rates.[16] Alagasco allegedly rescinded its offer to reduce the rates several months after Southern denied the tap to GUA. J. Hawkins Deposition at 257.

Defendants and plaintiff disagree as to the level of preparation which Tutcher and Levrier undertook with regard to the formation and development of GUA and its planned business. In an affidavit, Tutcher maintains that he and Levrier consulted several times with the Alabama Public Service Commission to determine if GUA's "direct connections" to industrial customers were permitted. They allegedly also discussed the issue of eminent domain and the use of public right of ways. Tutcher affidavit at 5. Mr. Tutcher also consulted with Unitec, a company which performed routing, right of way, and survey services. Unitec allegedly referred GUA to

---

12. A Special Contract is a contract between Alagasco and an individual customer which permits Alagasco to provide the customer with a rate which is lower than the standard tariff. Warren Deposition at 251–255.

13. A Competitive Fuel Clause permits Alagasco to lower its transportation rate to meet a rate offered by a competing energy source. Warren Deposition, Vol 3, 59–60. If Alagasco invokes the Competitive Fuel Clause, the Alabama Public Service Commission is informed.

14. Alagasco claimed that it has also reduced its transportation rates to certain industrial customers based upon a fear of competition from Southern. Memorandum at 15.

15. One of GUA's prospective "end users".

16. GUA claims that Alagasco had access to this information because its computer is linked with Southern's.

two construction companies to perform pipe laying cost analysis.

Concerning the financial aspects of the business, Tutcher asserts that he and Levrier had prepared financial projections and proformas concerning the economic viability of the services which GUA was to perform.[17] Moreover, Tutcher contends that Texline, Inc, a Texas company, had made a commitment to finance the project. Tutcher Affidavit at 5. Kenneth Holmes and Steven Herbst, the principals of Texline, had been involved in business with Mr. Tutcher in a company named Midcoast Transmission. Holmes deposition at 27. In his deposition Mr. Holmes stated that Texline would have provided financing to Gas Utilities *if the project had met the company's economic criteria.* Holmes indicated, however, that Tutcher *had never requested financing for a specific pipeline.* Mr. Herbst, the second principal, indicated that the company would have provided financing *had GUA presented it with a definitive project.* Herbst Deposition at 105. In addition, Tutcher himself stated in an affidavit presented to the court that he would have financed the project. He never stated this in his deposition nor provided evidence of how he would have accomplished it.

Both Southern and Alagasco maintain that GUA was inadequately prepared to engage in business with industrial customers. According to the defendants, GUA had no capital other than $1,000.00 of start up funds, no offices, no credit, and no operational history. Southern's Brief at 9. Alagasco's Memorandum at 10.[18] Tutcher and Levrier were the only employees of the company and did not receive any salary. Defendants maintain that GUA had no third party financing com-

mitment and never hired any professionals to develop plans for a pipeline. Defendants also claim that GUA never ascertained whether it would be subject to any regulatory authority nor applied for any permits or rights of way. *Id.* Moreover, defendants claim that the contracts which GUA had allegedly entered into were illusory since they contained *force majeure* type provisions which would excuse GUA's performance should the company be unable to secure rights of way or permits. Both were voidable upon adverse regulatory rulings. Southern's Brief at 18; Gas Purchase and Sales Agreement between Gurney Industries and GUA, Exhibit 122. Neither became effective until the date of first delivery.

## LEGAL CONTENTIONS OF THE PARTIES

After Southern refused to allow GUA to utilize taps, GUA filed this suit in March, 1991, alleging violations of federal antitrust laws and tortious interference with business relations in violation of state law. GUA set forth the bases for its claims in its third amended complaint.

### SECTION ONE CLAIM

In count nine of its amended complaint, GUA alleges that Southern and Alagasco had an agreement/understanding that Southern would not provide access to GUA to its interstate pipeline for the benefit of the end users which Alagasco was serving or which Alagasco could serve. GUA claims that this agreement violates Section 1 of the Sherman Antitrust Act.[19]

▮▮▮ To prevail under Section 1, GUA must satisfy a two part test.[20] First, GUA

---

**17.** In his affidavit, Tutcher refers to exhibits of these proformas and projections. None have been filed or submitted to the court.

**18.** Tutcher and Levrier's depositions provided this information regarding GUA.

**19.** In its brief, GUA refers to a dissent by a FERC commissioner commenting on the load loss provision contained in Southern's FERC-approved order settlement with its LDC customers. In this dissent Commissioner Stalon stated, "This is a classic cartel arrangement wherein Southern has promised its monopolistic local distribution com-

pany customers that if it bypasses their system to serve an end user directly, Southern will receive punishment in the form of absorption of the LDC's take or pay bill. This is anticompetitive ..." 46 FERC § 61,336. The Commission did, however, approve the settlement.

**20.** Section 1 provides "Every contract, combination, in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1. An agreement may be illegal if its purpose or effect is to create an unreasonable restraint of trade or

must demonstrate that the conspiracy is economically reasonable and would be economically beneficial to defendants. Second, GUA must adduce evidence of an *agreement*. Evidence that tends to exclude the possibility that the alleged conspirators acted independently and in a manner consistent with rational business objectives will satisfy this standard. *Bolt v. Halifax Hosp. Medical Center*, 891 F.2d 810, 820 (11th Cir.1990); *Monsanto Co. v. Spray–Rite Service Corp.*, 465 U.S. 752, 764, 104 S.Ct. 1464, 1470, 79 L.Ed.2d 775 (1984). GUA may rely on either direct or circumstantial evidence in meeting its burden of proof. *American Tobacco Co. v. United States*, 328 U.S. 781, 809–810, 66 S.Ct. 1125, 1138–1139, 90 L.Ed. 1575 (1946).

GUA advances the following arguments in support of its claims that Southern and Alagasco were parties to an agreement to restrain trade. First, GUA maintains that by obtaining exclusive dealing contracts with customers that GUA had contacted and by entering into a new and more favorable purchase agreement with Southern Marketing, Alagasco collaborated with Southern to foreclose any competition. In addition, GUA claims that Alagasco's rate reduction to potential GUA customers *following* Southern's denial of the taps, was not a manifestation of Alagasco's desire to compete with companies such as GUA. Instead, Alagasco was "hedging its bets", since Alagasco did not completely trust Southern. Plaintiff's Response at 5.

GUA also asserts that the conspiratorial nature of Southern and Alagasco's conduct is manifested through "conscious parallelism." *See American Tobacco Co., supra*, (holding that the existence of a conspiracy could be premised upon parallel pricing in competitive bidding behavior.)[21] GUA recognizes that to prevail with this argument it must come forward with significant evidence supporting its

theory of conscious parallelism and negating the possibility of independent action. In addition, GUA must show that the decisions not to deal were contrary to the defendants' economic self-interest so as to raise an issue as to their good faith business judgment. *Dunnivant v. BI State Auto Parts*, 851 F.2d 1575, 1583 (11th Cir.1988). In support of this contention, GUA has argued that there is evidence that Alagasco's rate reduction was illusory and "not the type of reaction that a business would make if it perceived a real economic threat." Plaintiff's Brief at 14.

GUA also claims that Southern has failed to demonstrate economically sound business reasons for refusing to grant it a tap to service a variety of customers in the Tuscaloosa area, including Tuscaloosa Steel.[22] Since granting GUA a tap to service Tuscaloosa Steel would have resulted in increased volume for Southern's line, GUA claims that sound business practice would have dictated granting a tap to GUA.

GUA also claims that ample circumstantial evidence exists which supports a finding of the existence of an agreement in restraint of trade. First, plaintiff points to the previously discussed agreement which Southern and Alagasco entered into to dismiss the complaints which each organization had filed against the other before the Alabama Public Service Commission. Plaintiff alleges that, after the defendants entered into this agreement, Southern never sought to solicit a direct connection in the Alabama area. Warren Deposition at 28.[23] Plaintiff also claims that, since the agreement, Alagasco has not sought another tap from Transco. Wiseman Deposition at 56. Second, plaintiff asserts that Alagasco's policy not to solicit any industrial accounts which were already served by an existing pipeline company is further evidence of an agreement not to compete, since

---

a *per se* violation of the statute. A restraint is unreasonable if it has an adverse impact on competition and cannot be justified as a procompetitive measure. *Seagood Trading Corp. v. Jerrico, Inc.*, 924 F.2d 1555 (11th Cir.1991).

**21.** GUA has not explained how Southern and Alagasco's conduct is parallel.

**22.** Southern maintains that GUA had never specified its prospective customers when it requested the tap.

**23.** The portion of this deposition on which plaintiff purports to rely does not state that Southern has never sought another direct connection. Instead, the deponent stated that he was *unaware* of any additional contacts with industrial customers.

a "rational" business would seek to solicit its competitor's business. Plaintiff's Brief at 17.

GUA also argues that the numerous opportunities Southern and Alagasco had to meet and agree is evidence of an agreement. GUA points to meetings and social gatherings, such as quail hunts, at which Alagasco and Southern executives had the occasion to mingle. A fourth argued circumstance pointing to an agreement was the alleged inconsistency in Southern's bypass policy.[24] Plaintiff cites *Bell v. Dow Chemical Co.*, 847 F.2d 1179, 1186 (5th Cir.1988) for the proposition that such inconsistencies are indicative of an agreement.[25]

Plaintiff asserts that the "SURF" agreement between Alagasco and Southern is also indicative of a conspiracy.[26] Pursuant to these agreements, Alagasco and other LDC's were not obligated to take their proportionate share of gas from Southern if Southern directly connected any customers previously serviced by these LDC's. None of the SURF agreements has received final approval from the FERC. GUA also claims that the high rates paid by consumers of natural gas in Alabama manifests that there is an agreement to eliminate competition. Another circumstance which GUA claims indicates that an agreement exists between Alagasco and Southern are the "flaws" which GUA claims underlie the previously discussed "death spiral theory."[27] GUA also suggests that the "take or pay" negotiations between Southern and customers such as Atlanta Gas Light, Alagasco and South Carolina Natural Gas are also indicative of a conspiracy. At

these "take or pay" negotiations, Alagasco and Atlanta Gas Light allegedly raised questions regarding bypass and direct connection. According to GUA, Southern agreed with its LDC customers, including Alagasco, that it would forfeit a portion of the take or pay settlement from the customer if it directly connected. GUA disputes Southern's contention that the settlement agreement, which was authorized by FERC, is immune from antitrust immunity.[28] According to GUA, Southern's filings of the take or pay agreements with FERC were only mandatory rate filings in compliance with FERC Orders no. 436 and 500 and could not confer antitrust immunity. *See* 1 P. Areeda & H. Hovenkamp, *Antitrust Law* Sec. 206.1 p. 81 (1991) (stating that pro forma rubber stamping cannot be transformed into concerted governmental action.) Plaintiff also cites *Cantor v. Detroit Edison Co.*, 428 U.S. 579, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976) for the proposition that Southern's filings of the take or pay settlement agreements with FERC were only mandatory rate filings which could not confer antitrust immunity.

The following four circumstances constitute GUA's final arguments that there is a reasonable inference of an agreement between Alagasco and Southern. The first is Alagasco's reliance on gas provided by Southern, and its failure to purchase local gas, which GUA claims is not rational behavior. Plaintiff's Brief at 22. Second, GUA claims that Southern's refusal to grant a tap to GUA to service Tuscaloosa Steel was also indicative of such an agreement.[29] Third,

---

24. As previously discussed, Southern executives set forth a policy which dealt with the granting of a bypass. Major Deposition at 112. Tutcher, however, maintains that Mark Limbaugh, a Southern representative, gave him different reasons for denying the taps.

25. After reviewing *Bell*, the court concludes that the case does not stand for the proposition that inconsistencies in a defendant's testimony were indicative of a conspiracy. Instead, the *Bell* court discussed inconsistencies in defendant's testimony concerning the reasons why he had refused to sell to the plaintiff. These inconsistent rationales raised a factual issue as to whether the defendant had a justified purpose in refusing to sell to the plaintiff.

26. The SURF negotiations refer to negotiations of long term service agreements between Southern and LDC customers. Alagasco's reply brief at 5.

27. As previously mentioned, plaintiff neglects to point out what these flaws are or how they manifest an agreement.

28. *See supra* p. 4.

29. As previously discussed, GUA maintains that this refusal conflicts with Southern's policy of granting a tap if it would provide "incremental volume." Since Tuscaloosa Steel had not previously received gas from Southern's line, a tap from GUA would have provided Southern with increased volume.

GUA maintains that Southern's claims that it would transport gas for GUA to existing delivery points was illusory since Alagasco controlled all delivery points on Southern's line.[30] Finally, GUA asserts that Southern's adoption of a direct connection policy in 1991 manifested an agreement between Southern and Alagasco, since Southern had acted upon a direct invitation from Mike Warren, an Alagasco official, in adopting this policy.[31].

Having presented evidence which it believes establishes the existence of an agreement, GUA discusses the economic reasonableness of the alleged conspiracy. *Matsushita Electric Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (an antitrust plaintiff may survive summary judgment if the conspiracy is rational and practically feasible.) GUA asserts that Southern and Alagasco have enjoyed "monopoly" profits since they control the supply and pricing of natural gas in Alabama. Plaintiff's Brief at 25. GUA maintains that Southern's and Alagasco's alleged dominance prevented GUA and other competitors from entering the market and suggests defendants' incentive for excluding them.

SECTION TWO CLAIM

▮▮▮ GUA also claims that Alagasco and Southern's actions violate Section 2 of the Sherman Anti–Trust Act.[32] The United States Supreme Court has defined monopolization as "the possession of monopoly power coupled with the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior project, business acumen or historic acts." *United States v. Grinnell Corp.*, 384 U.S. 563, 570–571, 86 S.Ct. 1698, 1703–1704, 16 L.Ed.2d 778 (1966). There are two elements to a conspiracy to monopolize: (1) concerted action by knowing participants who made specific attempts to achieve a monopoly and (2) the commission of at least some overt act in furtherance of a conspiracy. Monopoly power is "the power to control price or exclude competition." *United States v. E.I. Dupont De Nemours & Co.*, 351 U.S. 377, 391, 76 S.Ct. 994, 1004, 100 L.Ed. 1264 (1956). A monopoly may be inferred from a participant's having a predominant share of the market. *Grinnell, supra*, 384 U.S. at 571, 86 S.Ct. at 1704.

GUA claims that defendants have violated Section Two for the following reasons. First, GUA argues that Southern is the only interstate pipeline capable of servicing industrial end users in the relevant market area [33] and has refused to grant a tap to GUA. GUA asserts that Alagasco has also denied access to its facilities through its actions with regard to Hunt Refining.[34] Therefore, each

**30.** GUA has not indicated how Alagasco controlled the delivery points on Southern's line. The court surmises that GUA may be referring to its conversations with an employee of Hunt Refining, discussed more fully below. According to GUA, a Southern employee had suggested to Mr. Tutcher that he contact Hunt Refining about utilizing one of its taps in the Tuscaloosa area after it had denied GUA its tap. A Hunt employee allegedly informed Tutcher that the company needed to contact Alagasco before it could grant permission to allow GUA to utilize its tap. Alagasco allegedly notified Hunt that it was opposed to the idea of Hunt granting GUA a tap.

**31.** The circumstances surrounding the adoption of this new policy are as follows. In 1991, Southern was allegedly seeking to acquire North Carolina Gas Pipeline whose major asset was a local distribution company. According to GUA, Southern's intended acquisition of this LDC produced concern among Southern's LDC customers. GUA claims that, following calls to Southern from Alagasco's Warren and others, Southern adopted a new policy concerning direct connection.

**32.** This section states "Every person who shall monopolize, attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several states, or with foreign nations, shall be deemed guilty of a misdemeanor, and on conviction thereof, shall be punished by fine not exceeding fifty thousand dollars, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court." 15 U.S.C. § 2.

**33.** The relevant market area encompasses approximately ten miles on either side of Southern's interstate pipeline system in Central Alabama. Wilson affidavit. Southern has reserved its right to contest this market definition.

**34.** As previously discussed, Southern had suggested that GUA contact Hunt Refining to obtain a tap from Hunt's interconnection with Southern's line. Allegedly, a Hunt employee informed Tutcher that it would have to consult with Alagasco before it could permit GUA to take gas from Hunt's interconnection. Hunt allegedly denied GUA the right to obtain a tap after Alagasco denied it permission to grant the tap.

defendant has maintained its monopoly by preventing companies such as GUA from entering the market. Essentially, GUA claims that Southern sacrificed the opportunity to increase its load by granting a tap to service Tuscaloosa Steel in exchange for the assurance that Alagasco would not transfer its load to another pipeline such as Transco.

GUA also maintains that Southern has violated Section 2 because it has failed to make available an essential facility to GUA.[35] The four elements necessary to establish liability under the essential facilities doctrine are: (1) Control of the essential facility by a monopoly; (2) the competitor's inability to practically or reasonably duplicate the essential facility; (3) the denial of the use of the facility to the competitor; and (4) the feasibility of providing the facility. *Aspen Highland Skiing Corp. v. Aspen Skiing Co.*, 738 F.2d 1509 (10th Cir.1984).

GUA claims that the evidence demonstrates all of these elements. First, GUA asserts that it is undisputed that Southern retains control of its pipeline and will only grant connections to its pipeline to Alagasco. Second, GUA's expert has testified that it would be prohibitive to duplicate Southern's pipeline. Wilson Affidavit.

Further, that GUA has been denied use of the facility when it would have been feasible to do so.

*Standing*

Having discussed the merits of its antitrust claims, plaintiff next discusses the issue of standing. To maintain an action under the antitrust laws, a plaintiff must meet the criteria of Section 4 of the Clayton Act. Specifically, a plaintiff must meet a three part test: (1) that he is a "person" within the meaning of the Clayton Act; (2) that he was "injured" and the injury was of the type the antitrust laws were enacted to prevent; (3) that the injury affected his business or property; and (4) that the injury occurred "by reason of" a violation of the antitrust laws. *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990), (quoting *Brunswick Corp. v. Pueblo Bowl O Mat, Inc.* 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977).

GUA contends that courts have utilized a two prong approach in determining if a plaintiff has standing. First, it must be determined if a plaintiff has suffered "antitrust injury". *Todorov v. DCH Healthcare Authority*, 921 F.2d 1438, 1448 (11th Cir.1991). The second issue is whether the plaintiff is an efficient enforcer of the antitrust laws.[36]

GUA asserts that it has suffered antitrust injury in the following manner.[37] First, GUA asserts that Southern's refusal to grant GUA's requests for taps to supply end-users, including Tuscaloosa Steel and Gurney Industries, has precluded the possibility of effective market competition in the area.

To recover for an injury that is the consequence of a frustrated attempt to enter a market, plaintiff must demonstrate an intent to enter the business coupled with a showing of preparedness to enter the business. *Cable Holdings of Georgia, Inc. v. Home Video, Inc.*, 825 F.2d 1559, 1562 (11th Cir.1987).[38] Factors which indicate that a plaintiff is prepared include "the ability of the plaintiff to finance the business and to

---

**35.** Firms controlling an essential facility have the obligation to make the facility available on nondiscriminatory terms, and the failure to do so subjects them to Section 2 liability. *MCI v. American Telephone & Telegraph*, 708 F.2d 1081, 1132 (7th Cir.), *cert. den.* 464 U.S. 891, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983).

**36.** This determination focuses upon the status of the plaintiff as a direct target of the defendant's anticompetitive conduct or it being within the target zone of competitive restraint.

**37.** To prove an antitrust injury, plaintiff must show an injury "of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' act unlawful. The injury should reflect the anticompetitive effects either of the violation or of anticompetitive acts made possible by the violation." *Brunswick Corp, supra,* 429 U.S. at 489, 97 S.Ct. at 697.

**38.** *See also, Thompson v. Metropolitan Multi-List, Inc.,* 934 F.2d 1566, 1572 (11th Cir.1991), *cert. filed,* 60 U.S. L.W. 3522 (1982) (citing *Martin v. Phillips Petroleum Co.,* 365 F.2d 629 (5th Cir.) *cert. den.,* 385 U.S. 991, 87 S.Ct. 600, 17 L.Ed.2d 451 (1966)).

purchase the necessary facilities and equipment; the consummation of contracts by the plaintiff; affirmative action by plaintiff to enter the business; and the background and experience of plaintiff to enter the prospective business." *Jayco Systems v. Savin Business Machines Corp.*, 777 F.2d 306 (5th Cir.1985), *cert. den.*, 479 U.S. 816, 107 S.Ct. 73, 93 L.Ed.2d 30 (1986).

GUA contends that it has manifested the requisite level of intent and preparation to enter the gas distribution market. It argues that its preparation is evinced by its completion of market surveys; *communications* with the Alabama Public Service Commission *regarding* regulation, eminent domain pipeline connection facilities and industrial end users, (Tutcher Affidavit); preparation of a brochure; solicitation of industrial end users; the preparation of proformas (not in evidence); *inquiries* and *investigations* into costs and feasibility of pipeline connections; request for pipeline taps; financing "commitments" secured from Texline; purchase and sale agreements with Tuscaloosa Steel and Gurney Industries, Inc.; maps and geographic surveys; and inquiries to FERC. Tutcher Deposition at 503–505.

GUA disputes Southern's assessment of its preparatory measures. First, GUA states that Southern's assertion that the company's financing commitments must be in writing is not supported by the caselaw. It also argues that Southern's claims that GUA was unprepared since it had never laid any pipe is also specious since attempts to lay pipe would have been futile following Southern's denial of the use of its pipes. The court agrees that the latter argument with regard to "laying pipe" has merit.

Concerning the second prong of the standing analysis, GUA argues that it is an efficient enforcer of the antitrust laws since it was in the target area of defendants' conduct. GUA maintains that the defendants directly targeted GUA pursuant to an illegal agreement in restraint of competition. In addition, GUA claims that its injury "coincides with the public detriment tending to result from the alleged violation." *Austin v. Blue Cross and Blue Shield of Alabama*, 903 F.2d 1385 (11th Cir.1990).

Finally, GUA claims that it has presented evidence of damages and has thereby satisfied the requirement that a private antitrust litigant must prove that he suffered an injury to his business or property. Antitrust caselaw recognizes that the evidence may show "the extent of the damages as a matter of just and reasonable inference, although the result be only approximate." *Terrell v. Household Goods Carriers's Bureau*, 494 F.2d 16, 23–24 (5th Cir.), *cert. dis'd*, 419 U.S. 987, 95 S.Ct. 246, 42 L.Ed.2d 260 (1974). *See also Zenith Radio Corp v. Hazeltine Research, Inc.*, 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969) (quoting *Bigelow v. RKO Radio Pictures, Inc.* 327 U.S. 251, 264, 66 S.Ct. 574, 579, 90 L.Ed. 652 (1946) ("The Supreme Court has recently reminded us that trial and appellate courts alike must also observe the practical limits of the burden of proof which may be demanded of a treble damage plaintiff who seeks recovery for injuries from a partial or total exclusion from a market; damage issues in these cases are rarely susceptible of the kind of concrete detailed proof of injury which is available in other contexts.") GUA has offered estimates of the damages which it claimed it suffered—namely revenues which could have been realized absent defendants' actions. J.W. Wilson and Associates, plaintiff's economic expert, compiled these estimates. Therefore, plaintiff contends that it has offered sufficient proof on the issue of damages.

*Tortious Interference with Contractual and Business Relations Claim:*

In its final count, GUA accuses defendants of the tort of interfering with its contractual and business relationships. Under Alabama law, the elements of this cause of action are (1) the existence of a contract or business relationship; (2) defendants' knowledge of the contract or business relations; (3) intentional interference by the defendants with the contract or business relationships; (4) absence of justification for the defendants to interfere with contract or business relations and (5) damages to the plaintiff as a result of defendants' interference. *Bridgeway Communication, Inc. v. Trio Broadcasting, Inc.*, 562 So.2d 222 (Ala.1990).

GUA asserts that Alagasco has attempted to exclude it from the Alabama market. In response to GUA's solicitations of business, Alagasco disseminated questionnaires to its customers for questions to pose to GUA. GUA's Response at 44. GUA also accuses Alagasco of threatening customers which GUA had contacted. For example, GUA refers to a memorandum from Jeff Lowery, an industrial marketing representative of Alagasco, memorializing a conversation between him and a Mr. Burroughs, an employee of Tampko Asphalt. Tampko had allegedly asked Mr. Lowery if Alagasco would continue to serve a portion of its gas needs should it deal with GUA. In his memorandum, Mr. Lowery indicated that if Tampko did business with another supplier, Alagasco would either keep its facilities in place and charge a standby charge or remove its facilities.[39] Therefore, GUA asserts that Alagasco threatened its customers.[40] GUA also claims that Alagasco's alleged objection to allowing Hunt Refining to provide GUA with a tap also constituted interference with contractual relations.

Concerning Southern, GUA claims that its denials of taps and transportation services constitute affirmative acts of tortious interference. Specifically, it is argued that the threatened act of interference is defendants' illegal agreement in restraint of trade. GUA also claims that if the means used or the objectives sought are illegal, then the interference with another's business relations cannot be justified. *Griese–Traylor v. First Nat'l Bank,* 572 F.2d 1039–1045 (5th Cir. 1978).

In their motions for summary judgment, defendants contend that no claim of plaintiff has merit. The following are a summary of these arguments.

*Southern:*

Southern's argument can be divided into four sections. First, Southern contends that GUA cannot establish antitrust injury. Second, Southern alleges that GUA has failed to establish a conspiracy which is essential to both its Section 1 and Section 2 claims. Third, Southern claims that GUA cannot establish the anticompetitive purpose essential to a Section 2 unilateral conduct claim. Finally, Southern contends that it did not tortiously interfere with GUA's business.

*Absence of Antitrust Injury:*

Under Eleventh Circuit law, an antitrust plaintiff who claims that he has been frustrated from entering the market may prevail only if there is "(1) an intention to enter the business; and (2) a showing of preparedness to enter the business." *Cable Holdings, Inc. v. Home Video, Inc.,* 825 F.2d 1559, 1562 (11th Cir.1987), (quoting *Hayes v. Solomon,* 597 F.2d 958, 973, *cert. den.,* 444 U.S. 1078, 100 S.Ct. 1028, 62 L.Ed.2d 761 (1980). To demonstrate preparedness, a plaintiff must satisfy four elements (1) the ability to finance the business; (2) the consummation of contracts; (3) affirmative action taken by the plaintiff to enter the business; and (4) the background and experience of plaintiff in the business. *Hayes, supra,* 597 F.2d at 973. Southern contends that GUA cannot satisfy any of these elements.

Southern first contends that GUA lacked the ability to finance its business. According to Southern, a failure to obtain a definite written financial commitment from a financially capable source renders it unprepared as a matter of law. *Hayes, supra,* 597 F.2d at 975–976. (negotiations for a bank loan not evidenced by a writing did not constitute a financing commitment.)[41] *See also Jayco Sys. v. Savin Business Machines Corp. supra,* 777 F.2d at 315 (a bank officer's affidavit that she would have extended credit to the business did not indicate preparedness). Therefore, Southern asserts that Texline's willingness to provide financing if certain conditions were met was not sufficient to

---

**39.** Mr. Lowery indicated to Southern Resins–Lawler International that it would undertake the same steps should Southern Resins negotiate a contract with GUA. Plaintiff's Brief at 45.

**40.** It would appear to the court that this was a reasonable answer to a question rather than a threat.

**41.** It is not clear that *Hayes required* a written commitment. The court does seem to suggest the lack of a commitment "evidenced by a bank writing" to be a negative factor.

establish preparedness.[42] In particular, Southern points to a statement made by Holmes that he would have gone to a bank to secure financing. Since Holmes had never presented a GUA project to a bank, there could be no financing commitment.

Furthermore, Southern argues that Tutcher's assertions that he would have financed GUA also do not evidence the requisite preparation. Tutcher Affidavit. First, Tutcher presented no evidence that he could provide such financing and never so stated his willingness or ability in his deposition. Southern argues that Tutcher's assertions are also refuted by the record since the only funding source listed in GUA's tap requests to Southern were letters of credit from banks. Exh. 115 to Tutcher Deposition. Southern argues that pursuant to *Jayco*, Tutcher's discussions of his unsubstantiated personal wealth and his statements that he "would have" provided financing do not indicate that GUA was financially prepared.

Southern next argues that GUA failed to consummate the contracts necessary to enter its business with the exception of the contracts with Tuscaloosa Steel and Gurney industries, which Southern claims are illusory. According to Southern, the Clayton Act will protect only valid contracts. *Martin v. Phillips Petroleum Co.*, 365 F.2d 629, 633–634 (5th Cir.) *cert. den.*, 385 U.S. 991, 87 S.Ct. 600, 17 L.Ed.2d 451 (1966).[43] Specifically, Southern argues that the Tuscaloosa Steel contract was not a contract since it did not contain a price term and provided that it would expire if the parties did not agree on a price. The Gurney agreement would only become effective the date of the first delivery. Tutcher Deposition at 410. Both contracts also contained *force majeure* type provisions that would excuse GUA's performance if it could not obtain rights of way or permits for construction and maintenance of facilities.[44]

Third, Southern claims that GUA did not take the affirmative steps necessary to enter business. For example, the Eleventh Circuit has held that a plaintiff must make efforts to carry out construction of new facilities if such construction is required to enter a new business. *Cable Holdings, supra*, 825 F.2d at 1562. In *Cable Holdings*, a cable television company brought antitrust monopoly claims against a cable system operator, claiming that the operator had prevented its expansion. Plaintiff had failed to prepare detailed design maps, confer with utility representatives, and hire a contractor to install cable. The court determined that plaintiff was not prepared to begin service and enter the targeted market. *Id.* at 1562. *See also Hayes*, 597 F.2d at 974 (holding that plaintiff, who needed to construct a shopping center, failed to commission the timely drawing of a detailed engineering and architectural plan, and did not meet the Eleventh Circuit test for preparedness.) Southern argues that Tutcher and Levrier did not take any of the necessary steps to construct bypass facilities, including acquiring rights of way, performing surveys, securing government permits, and purchasing pipe. Southern's Brief at 21.

The Eleventh Circuit has also held that failure to obtain governmental and regulatory approvals indicates lack of preparation by an antitrust plaintiff. *See e.g., Cable Holdings, Inc., supra*, 825 F.2d at 1562. Southern asserts that GUA did not take steps necessary to obtain permits to commence construction or to obtain environmental permits. Moreover, GUA did not contact FERC regarding approval of a bypass facility. Tutcher Deposition at 517–520. Southern also dismisses GUA's discussions and communications with FERC and the Alabama Public Service Commission regarding necessary approvals and eminent domain rights as exploratory. According to Southern, courts have held that such preliminary efforts can-

---

**42.** As previously discussed, Texline principals indicated that they would have financed the project had there been a project to finance.

**43.** Southern cites *Martin* for the proposition that a contract that contains "infirmities" such as contractual conditions that are impossible to fulfill or the absence of terms that render an agree-

ment enforceable under state law is not a valid contract.

**44.** Southern has characterized GUA's brochure preparation and solicitations of other potential industrial end users as "preliminary overtures."

not confer antitrust standing. *Parks v. Watson,* 716 F.2d 646, 660 (9th Cir.1983).[45]

Responding to GUA's contentions that it was futile to take such steps absent a tap, Southern argues that such positions have routinely been rejected. *See, e.g., Jayco Sys., Inc., supra,* 777 F.2d at 314 (holding that the fact plaintiff could not have acquired machines from defendant even had it undertaken adequate preparations did not excuse plaintiff's failure to undertake such preparations). *See also Cable Holdings, Inc., supra,* 825 F.2d at 1561.[46]

*Absence of a Conspiracy:*

Having discussed the inadequacy of GUA's preparatory efforts, Southern next turns to the issue of whether GUA has established the conspiracy essential to its Section 1 and Section 2 joint conduct claims. Southern claims that GUA has not presented any evidence which would create a reasonable inference that Alagasco and Southern conspired regarding Southern's adoption of its policy not to directly connect end users or with respect to its application to GUA. In addition, Southern contends that its conduct does not support an inference of a conspiracy since "conduct that is as consistent with permissible competition as with illegal conspiracy cannot support an inference of conspiracy." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 588, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Pursuant to *Matsushita,* a plaintiff must produce evidence which shows that the alleged conduct is not "economically implausible" and evidence that "tends to exclude" the possibility that Southern and Alagasco acted independently. Southern asserts that GUA has failed to submit evidence demonstrating either of these requirements.

Concerning the economic plausibility of Alagasco's price cutting to its industrial customers, Southern asserts that it is indisputable that these reductions could only make sense if Alagasco had not entered into an agreement with Southern to refuse to supply competitors such as GUA. In its brief, Southern attempts to demonstrate the flaws in and inconsistencies in GUA's reasoning. For example, GUA first asserts that Alagasco's price cutting was a "sham" to mask the conspiracy. GUA later suggests in its brief, however, that this price cutting was predatory conduct. Second, Southern finds fault with GUA's assertions that Alagasco lowered its rates only after it had learned of Southern's denial of the tap requests. Southern argues that the president of Alagasco, Mike Warren, directed its employees to contact the company's customers, to inform them that it would compete with GUA, as soon as it learned of GUA's formation in 1989. Warren Deposition at 292.

Southern also disputes GUA's contention that there was a *quid pro quo* whereby Alagasco would refuse to take gas from Transco, Southern's competitor, in exchange for Southern's refusal to connect potential competitors of Alagasco. Southern claims that the record contains no evidence of such an agreement.

Southern next turns to the circumstances which GUA claims do not exclude the possibility that Southern acted independently. First, Southern addresses GUA's theory that Southern and Alagasco mutually agreed to dismiss proceedings each had filed before the Alabama Public Service Commission against the other. Southern contends that there is no evidence from which such a conspiratorial agreement can be inferred.[47] Southern also contends that GUA's theory that Southern and Alagasco had entered into an agreement in 1985 not to compete lacks merit, since GUA also contended that Southern had conducted a 1987 study which suggested that bypass *would be* profitable for Southern.[48]

---

**45.** Southern also cites *Hayes v. Solomon, supra,* for this proposition. However, the efforts which the court found inadequate to constitute preparation in that case did not constitute preliminary studies as much as studies done in preparation for litigation.

**46.** See, however, *Jayco,* 777 F.2d at 315.

**47.** An official of Southern stated in a deposition that it had withdrawn its complaint because it was evident that it would not prevail. Major Deposition at 77.

**48.** GUA maintains that Southern had ignored the results of the study. However, Southern claims that it did not adopt GUA's characterization of the study as showing bypass would be profitable.

Southern also takes issue with GUA's suggestions in its brief that the "take or pay" settlement with LDC customers is indicative of an unlawful agreement. According to Southern, actions which have been authorized by a regulatory agency are immune from antitrust liability. *Williams Elec. Co. v. Honeywell, Inc.*, 772 F.Supp. 1225, 1229 (N.D.Fla.1991) ("private parties are shielded from antitrust immunity where their actions were regulated by a federal regulatory agency ... and the actions in question was authorized or directed by that regulatory agency."). Southern states that GUA's reliance on *Cantor, supra*, is misplaced since the issue in that case was state action, not federal antitrust immunity. Moreover, Southern contends that FERC's actions were not merely "rubber stamping" that would not permit antitrust immunity, (as GUA has contended), but rather was mandated by a District of Columbia ruling.[49]

Southern also disputes GUA's claims that conversations between Alagasco and Southern officials are indicative of a conspiracy. Supplier distributor communications cannot constitute evidence that tends to exclude the possibility of independent action unless there is (1) an initial complaint by the distributor; followed by corrective action by the supplier; and reassuring communication from the supplier that corrective action has been taken. *Winn v. Edna Hibel Corp.*, 858 F.2d 1517, 1520–1521 (11th Cir.1988). Southern argues that GUA has presented no evidence that Alagasco complained to Southern. Nor is there evidence that Southern denied the taps in response to a complaint made by Alagasco. Finally, Southern claims that it never made a reassuring communication to Alagasco about the actions which it allegedly took.

Southern also argues that its refusal to deal with GUA cannot constitute a violation of Section 1, even if Southern denied GUA taps in response to Alagasco's request, because the companies acted with different goals. In support of this contention, South-

ern relies on *Garment Dist. v. Belk Stores Serv., Inc.*, 799 F.2d 905 (4th Cir.1986), *cert. denied*, 486 U.S. 1005, 108 S.Ct. 1728, 100 L.Ed.2d 193 (1988) (no anticompetitive agreement could be inferred where manufacturer and distributor pursued different goals).

With regard to its policy on direct connections, Southern asserts that it is undisputed that it acted unilaterally in denying the taps to GUA. Further, Southern maintains that GUA's arguments concerning the benefits to Southern of a Tuscaloosa Steel bypass are irrelevant.[50] Southern argues that Tuscaloosa Steel was only one of ten industrial end users that GUA sought to connect in the Tuscaloosa area and "the remote possibility of some incremental volume for Tuscaloosa Steel offered no reason for Southern to have evaluated its entire policy." Southern's Reply Brief at 23. In addition, Southern claims that it was concerned that granting an additional bypass would result in its losing residential and commercial customers. Specifically, Southern feared that if it allowed its industrial end users to bypass Alagasco it would have to spread its costs over a smaller customer base. Southern would then have to pass the increased costs onto its residential and commercial customers who might then turn to alternative sources of fuel. Southern also asserts that it did not wish to lose its share of the take or pay costs which its LDC's assumed. Southern also claims that it feared that it would be required to grant additional requests for industrial end users pursuant to FERC's anti-discrimination proceedings.

Southern states that its situation is analogous to that found in the case of *Todorov v. DCH Healthcare Auth.*, 921 F.2d 1438 (11th Cir.1991). In that case, plaintiff accused a hospital of conspiring to suppress competition among radiologists using its radiology facilities. Todorov argued that the hospital's denial of privileges in the radiology department was contrary to its own interest in that it would not encourage competition among

**49.** *Associated Gas Distributors v. FERC*, 824 F.2d 981 (D.C.Cir.1987) held that the regulatory scheme affecting interstate pipelines such as Southern's failed to take into account the issue of "take or pay" compensation.

**50.** As previously mentioned, GUA argues that Southern would have experienced an increase in volume as a result of a connection with Tuscaloosa Steel through GUA.

radiologists and result in lower prices for their services. The Eleventh Circuit held that the hospital could have had other justifications for suppressing competition by denying Todorov privileges, such as maintaining a better quality of service. Therefore, it affirmed summary judgment in favor of the defendants.

*Lack of Anticompetitive Purpose:*

Southern next turns to GUA's Section 2 Unilateral conduct claims. *United States v. Colgate,* 250 U.S. 300, 307, 39 S.Ct. 465, 468, 63 L.Ed. 992 (1919) sets forth the applicable law in this area. In that case, the Court held, "In the absence of any purpose to create or maintain a monopoly, Section 2 does not restrict the long recognized right of a trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal." "Moreover, a monopolist's refusal to deal is actionable only where the refusal is designed to have an anticompetitive effect". *Mr. Furniture Warehouse, Inc. v. Barclays Am./Commercial, Inc.,* 919 F.2d 1517, 1522 (11th Cir.1990). Southern argues, therefore, that the Section 2 claim should fail since its actions did not have anticompetitive effect.

First, Southern argues that it did not compete with GUA, since GUA sought to solicit prospective customers of Alagasco, not customers of Southern. Merely because Southern had the capacity to compete with Alagasco for end users did not make Southern a competitor of GUA.[51] In this respect, Southern claims its situation is analogous to that found in *Official Airline Guides Inc. v. FTC,* 630 F.2d 920 (2nd Cir.1980). In that case, a monopolist publisher of airline schedules refused to publish information pertaining to commuter airline connecting flights. The commuter airlines subsequently filed suit. Since the publisher did not compete with the commuter airlines, the court concluded that there was "no anticompetitive motive or intent with respect to the airline industry." [52]

Second, Southern maintains that GUA has failed to demonstrate how Southern's refusal to allow new taps has maintained or created monopoly power.[53] Southern maintains that regardless of whether GUA was granted the taps it wished in the downstream intrastate distribution market, Southern's strength in the interstate transportation market remains unaffected.

Southern next takes issue with GUA's "essential facilities" argument.[54] Southern asserts that this claim should fail for the following reasons. First, as previously discussed, Southern claims that GUA cannot show that the denial of taps was capable of contributing to monopoly power. Second, GUA is not a competitor of Southern. Third, Southern maintains that it did not deny access to an essential facility to GUA since Southern was willing to ship all the gas which GUA required [55]—Southern only refused to construct new taps onto existing system facilities. In support of this contention, Southern refers to *City of Chanute v. Williams Natural Gas Co.,* 955 F.2d 641 (10th Cir.1992). In that case, certain cities brought an antitrust action against a pipeline company after the

---

**51.** Southern had not directly connected a customer in Alagasco's service area for 21 years.

**52.** *Official Airline Guides* discusses the case of *Otter Tail Power Co. v. United States,* 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973). In *Otter Tail* the Supreme Court addressed the refusal of a regulated industry to sell power wholesale or to transmit power purchased from other sources to municipalities which owned their own retail distribution systems. In holding that Otter Tail's refusal to sell or distribute violated Section 2, the Court observed that monopolizing the market of transmission was used to further a monopoly in the market of retail distribution. *Id.* at 377–379, 93 S.Ct. at 1029–1030. GUA has not attempted to analogize its situation to that of the distributor in *Otter Tail.*

**53.** In its opposition, GUA has accused Southern of possessing a natural monopoly since it was the only interstate pipeline capable of servicing industrial end users in the market area.

**54.** To establish liability under the essential facilities doctrine, one must demonstrate (1) control of an essential facility by a monopolist; (2) a competitor's inability practically or reasonably to duplicate the essential facility; (3) the denial of the use of the facility to a competitor; (4) the feasibility of providing the facility.

**55.** Southern makes this contention in a footnote on page 33 of its brief and in the December 6, 1989 letter to Dan Tutcher from Mark Limbaugh.

company terminated a program whereby the cities could purchase gas from third party suppliers to be transported in the company pipeline. The Tenth Circuit found that there was no denial of access to essential facilities where the pipeline rejected plaintiff's proposed transaction but was willing to supply their full requirements of gas in a more expensive and more inconvenient manner.[56]

Finally, Southern argues that the tortious interference with business claim is also without merit since Southern has not undertaken any affirmative acts that could constitute tortious interference. Southern never contacted any of GUA's future customers. Since GUA has submitted nothing that indicates that Southern engaged in affirmative acts of interference, its tort claim should fail.

*Alagasco:*

Alagasco also contends that GUA's antitrust claims are meritless for the following reasons. First, Alagasco, like Southern, maintains that GUA has presented no evidence of concerted action with Southern. Alagasco asserts that it merely reacted to GUA's attempts to woo Alagasco's industrial customers by contacting these customers, making clear its intention to compete on price, and lowering its transportation rates.[57]

Furthermore, Alagasco argues that the evidence which GUA has submitted does not imply the existence of an illegal conspiracy with Southern. Alagasco initially discusses GUA's assertion that Alagasco has refused to take more gas from Transco in exchange for Southern's refusal to provide access to interstate pipelines. Alagasco maintains that it takes as much gas from Transco as it possibly can, Warren Deposition vol. 3, 37–39, and that GUA's *quid pro quo* theory is therefore specious.

Alagasco also disputes GUA's contentions that gas rates in Alabama are higher than in other states, despite the fact that Alabama has a supply of natural gas. According to Alagasco, the Alabama Public Service Commission regulates the rates for natural gas. Alagasco attributes the higher gas rates for industrial customers in Alabama to the policy decisions of the Public Service Commission.

Alagasco also claims that GUA's suggestion that it has a policy "not to compete" is untrue. Basically, Alagasco claims that it has proffered ample evidence of its efforts to compete. Its failure to solicit industrial customers under contract with a municipal gas system is not indicative of an unwillingness to compete.

Alagasco likewise claims that the "take or pay" and SURF negotiations are not indicative of a conspiracy. Concerning the "take or pay" agreements with whereby Alagasco's and other LDCs' share of take or pay costs would be reduced proportionately if a bypass occurred, Alagasco maintains that there is no evidence that Southern and its LDC customers such as Alagasco ever discussed situations in which Southern would bypass its LDC customers. Alagasco also argues that the load loss provisions in the long term service agreements [58] do not evince a conspiracy.

Alagasco next turns to the Section 2 claim. First, Alagasco reiterates that GUA has presented no evidence which would indicate that it conspired with Southern to deny GUA access to its taps. Second, Alagasco argues that GUA has failed to demonstrate a connection between the injuries which GUA asserts it has suffered and Alagasco's conduct.[59]

---

**56.** After reviewing *City of Chanute,* the court concludes that Southern's assertion that this is "directly on point" is overstated. In *City of Chanute,* defendant had granted plaintiffs access to the pipeline. Despite Southern's assertions to the contrary in its reply brief, none of the extensive materials submitted to the court indicates that GUA could have otherwise gained access to *Southern's pipeline.*

**57.** In footnote 4 to its reply brief, Alagasco states that GUA incorrectly stated that Alagasco rescinded its offer to lower Tuscaloosa Steel's

transportation rates. Alagasco asserts that GUA was referring to a proposal to buy gas on Tuscaloosa Steel's behalf.

**58.** Referred to as SURF negotiations.

**59.** *See Mr. Furniture, supra,* 919 F.2d at 1520 (holding that there must be a causal connection between the alleged antitrust violation and the antitrust injury for there to be antitrust standing).

Finally, Alagasco addresses GUA's claim of tortious interference with business relations.[60] First, there is nothing which would suggest that Alagasco was involved in Southern's decision with regard to GUA. Therefore, GUA has failed to satisfy the elements of "intentional interference with the contract or business relations" and "damage to the plaintiff as the result of the interference". *Bridgeway Comm., Inc., supra,* 562 So.2d at 223 Second, GUA's accusations that Alagasco threatened and contacted its customers in response to GUA's initiative are unfounded for the following reasons. Alagasco maintains that it contacted *its* own customers in response to GUA's efforts to woo them from Alagasco and that such customer contacts are not actionable under Alabama law.[61] In terms of the alleged threats made to customers, Alagasco accuses GUA of "exaggerating." These "threats" to which GUA alludes refer to Alagasco's statements to two of its customers, Southern Resins and Tampko Asphalt, that it would remove the metering equipment or charge a standby charge should these customers utilize another gas supplier. T.I. Hawkins Deposition at 222–225.[62] Alagasco argues that this does not constitute a threat and is not actionable as a tort.

Alagasco next addresses GUA's claim that Alagasco interfered with GUA's dealings with Hunt Refining. First, Alagasco claims that Tutcher's testimony as to what an Alagasco employee had told him is hearsay that is not within any exception. Moreover, even if Tutcher's testimony in this regard is ad-

missible, Alagasco argues that it cannot support a tortious interference claim.[63] Finally, Alagasco adopts Southern's arguments concerning GUA's unpreparedness, claiming that the company lacks standing.[64]

## LEGAL CONCLUSIONS

As both plaintiff and defendants have acknowledged, whether or not GUA has standing as an antitrust plaintiff is a threshold issue.[65] Therefore, the court will first address this question.

It is well established that a plaintiff which wishes to recover for an antitrust injury which arises from a frustrated attempt to enter a market must demonstrate (1) an intention to enter the business and (2) a showing of preparedness to enter the business. *Hayes v. Solomon,* 597 F.2d at 973.

Courts have evaluated the following factors in assessing a company's preparedness. These include: "the ability of the plaintiff to finance the business and to purchase the necessary facilities and equipment; the consummation of contracts by the plaintiff; affirmative actions by the plaintiff to enter the business and the background and experience of plaintiff in the prospective business." *Martin v. Phillips Petroleum Co.,* 365 F.2d at 633–34. The initial question before this court is whether, assuming that Southern had been willing to allow GUA access to its pipeline through the construction of new taps, GUA was *prepared* to enter the gas distribution market in Alabama.[66]

---

**60.** The elements of this claim have been set previously set forth.

**61.** *See Public Systems Inc. v. Towry,* 587 So.2d 969, 973–974 (Ala.1991) (holding that contacting a competitor's customers does not constitute interference with business relations.)

**62.** Alagasco stated that it would be unfair for it to maintain its expensive metering equipment for a company which is not paying for it.

**63.** In its brief, Alagasco states that Tutcher testified in his deposition that Hunt Refining had consulted with Alagasco before deciding whether to allow GUA to "tie into" Hunt's facilities and that an Alagasco employee had informed him that the company was opposed to the idea.

**64.** After the foregoing was prepared, the court provided the parties with a copy. Each party

acknowledged that the foregoing is a fair and complete statement of the undisputed facts, the argued facts, the issues which must be addressed by the court and the parties' contentions with respect thereto.

**65.** The issue may be more one of sufficiency of evidence as to an essential element than "standing." Injury to business or property is an essential element. 15 U.S.C. § 15. *Jayco* does refer to a lack of "standing." 777 F.2d at 313.

**66.** While the evidence may be sufficient to establish "intention," the two requirements of intention and preparation are not entirely severable. Lack of true intention may be demonstrated by a lack of significant preparation. A lack of real intention may lead to a lack of preparation. In *Jayco,* the court said that the evidence of "intention" was weak, but sufficient. 777 F.2d at 314.

Plaintiff and defendants have different perceptions of plaintiff's preparation and ability to enter the market. Plaintiff claims that it was highly prepared while defendants assert that GUA was inadequately prepared. Concerning the financial aspect of the business, the two principals of Texline, Mr. Holmes and Mr. Herbst, stated in their depositions that their company had financed every project which Mr. Tutcher had presented to it.[67] Mr. Herbst indicated that his companies had advanced funds to GUA to pay for Mr. Tutcher's office expenses and travel expenses. Herbst Deposition at 60. Neither Mr. Tutcher nor Mr. Levrier had indicated what amount GUA would need in capital from Texline. *Id.* at 65. GUA never presented Texline or either of its principals with a definite project which needed financing. *Id.* at 61. Mr. Herbst stated, however, that "in all probability" Texline would have financed GUA's project *had* Mr. Tutcher and Levrier *presented him with a project. Id.* Mr. Holmes also stated in his deposition that if GUA "had gotten a deal, we would have provided financing *if* it met our economic criteria, and I believe that if Dan Tutcher had submitted it to us it would have." (Emphasis added). Holmes Deposition at 42. Mr. Holmes indicated that Texline would finance Mr. Levrier's share of GUA's business, although, according to Mr. Holmes, Mr. Levrier "didn't want any kind of commitment between us, so it was left open." Texline would purportedly have obtained the money for financing GUA from a bank.

The second factor in evaluating preparedness is the consummation of contracts by plaintiff. GUA points to purchase and sale agreements entered into with Tuscaloosa Steel and Gurney Industries. Defendants contend, however, that these sale agreements were illusory for the following reasons: (1) they contained broad *force majeure* type provisions; (2) neither contract became effective until the date of first delivery; (3) both were voidable upon adverse regulatory rulings;

and (4) the Tuscaloosa Steel agreement contained no price term.[68]

A third element in determining if a company is prepared is whether plaintiff has taken affirmative actions to enter the market. Plaintiff claims that it performed market surveys, communicated with the Alabama Public Service Commission, commissioned maps and geographic surveys, made inquiries regarding the necessity of regulation by FERC, and made inquiries into costs and feasibility of pipeline connections. Defendants assert that these purported efforts are all insignificant, since GUA never obtained any right of ways or regulatory permits nor ever proceeded to lay pipe.

In *Martin v. Phillips Petroleum,* 365 F.2d 629 (5th Cir.1966), the plaintiff claimed that defendants had violated the Sherman Act by taking over and replacing him in the acquisition of a gasoline plant which he hoped to buy. Martin had been granted a sub-option and hoped to purchase the plant with financing from a bank. Following negotiations, the bank informed Martin that his proposal was not acceptable to it and offered him participation in a revised deal whereby he would have received a three sixteenths interest in the deal. Martin never received alternative financing and subsequently commenced the antitrust suit. The Fifth Circuit held that Martin was unprepared to undertake the operation of a gas plant and thereby did not have antitrust injury. In reaching this result, the court held that Martin had proven no ability to finance the project, had made no investment in facilities or equipment, and had no experience in the operation of a gas plant.

In *Hayes v. Solomon,* 597 F.2d 958 (5th Cir.1979), plaintiffs accused defendants of conspiring to monopolize the motion picture exhibition business in Port Arthur, Texas. Plaintiffs had not sought to have architectural plans drawn up, although they had received a proposal from an architect which they had not responded to for several years.

---

67. Mr. Herbst indicated in his deposition that Tutcher is obligated to present any venture undertaken by Midcoast Natural Gas, Tutcher's company, to Texline and Midcoast Transmission, another company with which Herbst is involved. Herbst Deposition at 53.

68. Plaintiff has not addressed any of these contentions in its submissions to the court.

Plaintiffs had no commitments from tenants. Plaintiffs' own witness testified that financing would not be available without such commitments. Plaintiffs had worked with architects and construction engineers; however, this work had been performed in preparation for litigation. The court held that plaintiffs were unprepared and had failed to prove an essential element.[69]

In *Jayco Systems v. Savin Business Machines Corp.*, 777 F.2d 306 (5th Cir.1985), plaintiff, an independent dealer of photocopiers, sued a manufacturer alleging antitrust violations. Plaintiff contended that it was prepared to expand its business and that Savin had frustrated this attempt through its failure to supply machines. In order to demonstrate that it was financially prepared to bid on the machines, Jayco submitted the affidavit of a former senior vice president of a bank. The bank employee examined the creditworthiness of Jayco as well as the profit history of the state contracts for which Jayco was bidding and stated that she would have extended credit to Jayco.[70] The court held that this affidavit was not "significant evidence demonstrating the existence of a genuine fact issue regarding preparedness." *Jayco*, 777 F.2d at 315. The bank official had not considered the fact that the contracts did not guarantee the placement of copiers with state agencies.[71] In addition, her evaluation of company's credit history as "excellent" did not take into consideration Jayco's repayment history with Savin and Canon which had been described as "good" and

"generally satisfactory." Finally, nobody from Jayco had approached anyone about financing the purchase of the copying machines.

In *Cable Holdings v. Home Video, Inc.*, 825 F.2d 1559 (11th Cir.1987), the court considered the issue of an attempt by a cable company to expand its business into additional territories. In its appeal, plaintiff claimed that the jury was improperly instructed regarding the issue of preparedness.[72] The Eleventh Circuit stated that the special verdict was appropriate for the following reasons. First, plaintiff had not prepared cash flow estimates and financial statements to determine the profitability of its proposed expansion. Nor had plaintiff applied for permits or prepared design maps for the expansion. Finally, plaintiff had never sought FCC approval for the expansion.[73]

Professors Areeda and Hovenkamp have discussed the issue of fledgling companies which assert that a defendant's antitrust violations precluded them from entering business. Their treatise states, "Courts continue to be vexed by the plaintiff who claims he would have gone into business had the defendant's antitrust violation not kept him out. After all, cartels or dominant firms may undertake improperly exclusionary behavior designed to keep prospective entrants out of the market,[74] for such behavior may well be cheaper than doing battle after a new entrant is established. On the other hand, many exclusion claims seem tenuous at best, and

---

**69.** *Hayes* refers to the requirements of intention, preparation *and capability. Id.*, 597 F.2d at 978. It also states: "The mere possibility of financing being available in the abstract is not enough. Showing that someone somehow could possibly obtain financing is not the same as showing that plaintiffs themselves were able and prepared to do so."

**70.** This basic evidence was arguably more significant than that presented by plaintiff here. Here there is no evidence of a project feasibility consideration by any potential financial resource.

**71.** *Cf.* to plaintiff's "contracts" here.

**72.** Although the issue related to a jury instruction, the court extensively discussed the evidence, or lack thereof, of preparedness and held that "there was ample evidence to support the

jury's special verdict which found that Cable Holdings was not prepared to enter the western territory." *Id.*, 825 F.2d at 1561.

**73.** Note 4 of *Cable Holdings* emphasizes the significance of the "preparation" requirement. It states:

Cable Holdings contends that the Cobb County Board of Commissioners' decision to grant them a franchise in the western territory conclusively proves that they were prepared to expand their business. We disagree. Permission to enter a business may well precede by many months or even years a business company's ability, financially and technically, to implement the franchise.

*Id.*, at 1563.

**74.** *See e.g.*, Salop, Strategic Entry Deterrence, 69 Am.Econ.Rev. 335 (1979).

most new businesses in the United States fail, most of them for reasons that have nothing to do with antitrust policy.

Aware of this policy dilemma, the courts have entertained claims of precluded entry, but not too readily. The plaintiff's intent to enter a market, standing alone, is seldom sufficient to confer standing. Ordinarily, he must show certain "sunk" or irreversible commitments, such as plans prepared by a professional builder, loan commitments from financial institutions, contracts with prospective customers, or substantial expenditures for marketing or advertising. He must also be able to show damages that are cognizable under the antitrust laws. Lost profits will probably be too speculative, for the plaintiff has no earnings record. As an alternative, costs thus far invested in the project may be an appropriate measure of damage. Of course, if anticipated profits can be reasonably estimated, they may be recovered." Areeda & Hovenkamp *Antitrust Law* 340.2j.

The court initially notes that none of the aforementioned cases which deal with the issue of preparation present an factual scenario which is identical to the instant case. Unlike the plaintiffs in *Jayco*, who had not even inquired about financing, Tutcher and Levrier had discussed possible sources of funds. Unlike the *Hayes* plaintiffs, who had consulted with architects and prepared plans only in preparation for litigation, GUA purports to have performed market surveys and communicated with regulatory agencies for the purpose of advancing their business. Regardless of the timing, however, the preparation here was certainly no greater than that in *Cable Holdings, Hayes,* or *Jayco. Hayes* is particularly persuasive.

The court recognizes that Mr. Herbst and Mr. Holmes previously had worked with Mr. Tutcher and had financed several previous projects. Both apparently appreciated the quality of his endeavors. The court cannot question the respect which both principals of Texline held for Mr. Tutcher based upon past projects in which they had been involved with him. Nonetheless, these feelings of confidence in Tutcher's past endeavors cannot translate into the type of financial prepa-

ration that satisfies the *Hayes* standard. "The mere possibility of financing being available in the abstract is not enough showing that someone somehow could possibly obtain financing is not the same as showing that plaintiffs themselves were able and prepared to." *Hayes,* 597 F.2d at 975. GUA did not provide Texline with information as to how much capital it would need to complete its project. Herbst Deposition at 47. In addition, Texline indicated that it planned to obtain financing for GUA's projects from banks. Texline, however, had not contacted any banks regarding financing for GUA's project. There was not the bare bones of information upon which anyone could assess the feasibility of a project. There was no discussion of the terms of any investment or loan; only financing in the "abstract." Therefore, the court concludes that GUA has not demonstrated the requisite financial preparedness to have suffered antitrust injury.

Other required factors of "preparation" are likewise deficient. There were no contracts as such. At best there were indications of interest if the price and other terms were right. There was certainly no "consummation" of contracts. There is no evidence of a plan whereby plaintiff could successfully undercut Alagasco's prices and have the financial ability to repay loans. There is no substantive evidence of what capital expenditures would be required. There is no substantial evidence of the likely cost of acquiring right of ways or other significant costs for consideration by proposed lenders or otherwise. All GUA did was to contact businesses which might advise them in these areas. *Cf., Hayes,* 597 F.2d at 974. Plaintiff's "preparation" can best be styled as an idea coupled with a hope, plus some minimal investigation to explore potential, and some indication of interest from potential customers.[75] There is no substantial evidence of tangible preparation. There is no evidence that plaintiff's agents ever discussed any specific project or plan of financing. There was certainly no oral or written financial commitment; only a suggestion that the project would have been given strong consideration. The absence of contracts also has a bearing

---

75. It is axiomatic that customers will change *if*    they can buy the same product cheaper.

on the ability to finance. While the court does not hold that plaintiff had to lay pipelines after Southern rejected its requests, plaintiff cannot simply use Southern's denial to create an inference of antitrust injury to business or property. In *Jayco*, Judge Goldberg stated: "This rule denies recovery to those persons who, because the existence of their business was entirely speculative, could not have suffered injury in fact. While recognizing that the plaintiff need not show an injury to an ongoing business, the rule serves to protect defendants from multiplicative recoveries." *Id.*, 777 F.2d at 313–14.

Even if plaintiff satisfies the preparation element, the Section 1 and 2 conspiracy claims are due to be denied for the following reasons. As all parties have acknowledged, a conspiracy can be proven by direct evidence or inferred from circumstantial evidence. *Key Enterprises of Delaware, Inc. v. Venice Hosp.*, 919 F.2d 1550, 1563 (11th Cir.1990). Both defendants and plaintiff agree that GUA has not proffered any direct evidence of a conspiracy. Nor is the circumstantial evidence which GUA asserts can be used to infer a conspiracy sufficient to establish a conspiracy. With regard to the rate reductions which Alagasco made to certain industrial customers, GUA has failed to present any evidence which would indicate that it was a "sham" as it claims.[76]

GUA contends that defendants' agreement to dismiss proceedings filed against each other with the Alabama Public Service Commission was indicative of an agreement, since Alagasco never sought another tap from Transco and Southern never sought to directly connect any industrial customers. However, an Alagasco official testified that Alagasco is currently taking as much gas as it can

from Transco. Warren Deposition, Vol. 3 at 37–39. In addition, Southern had not directly connected an industrial customer since the late seventies.

The principles set forth in *Dunnivant v. Bi–State Auto Parts*, 851 F.2d 1575 (11th Cir.1988) govern plaintiff's "conscious parallelism" claim.[77] The *Dunnivant* court held that a plaintiff must demonstrate that the decision not to deal was contrary to a defendant's economic business interest so as to raise an issue of good faith business judgment. *Id.* at 1583. In the instant case, defendant Southern has proffered sound business reasons for refusing to grant taps to GUA.[78] Moreover, GUA has offered nothing to refute Southern's justification.[79]

Finally, the court turns to GUA's allegations that the take or pay settlements which GUA had entered into with its local distribution companies indicated that Alagasco and Southern had entered into an agreement. The court initially notes that GUA has not attempted to explain how this settlement, which Southern entered into with all of its LDC customers, suggests a conspiracy. Furthermore, the take or pay settlement was approved by the Federal Energy Regulatory Commission. *See* 43 FERC 61,336, (1989). Courts have held that actions or agreements which are authorized by a regulatory agency acting pursuant to congressional authority are immune from antitrust liability. *Williams Elec. Co. v. Honeywell, Inc.*, 772 F.Supp. 1225, 1229 (N.D.Fla.1991).

Plaintiff has cited *Helicopter Support Systems v. Hughes Helicopter*, 818 F.2d 1530 (11th Cir.1987). The case is clearly distinguishable. In that case, there was direct evidence of an agreement to fix re-sale prices in violation of the law (*Id.*, 1535–36), plus

---

**76.** GUA had accused Alagasco of withdrawing its offer to lower rates to Tuscaloosa Steel after GUA had been denied the taps by Southern. However, an Alagasco official stated in his affidavit that Tuscaloosa Steel received a discount of 53%. Wright Affidavit.

**77.** Pursuant to this theory, GUA accuses Southern and Alagasco of parallel conduct which is suggestive of a conspiracy.

**78.** This evidence consists of testimony from employees and officers indicating that it would lose

take or pay compensation if it bypassed its LDC customers.

**79.** As previously mentioned, GUA has asserted that Southern would have been able to transport additional gas to Tuscaloosa Steel, a potential GUA customer. However, Southern has indicated that the possibility of transporting additional volume of gas is only one consideration in determining whether to grant a bypass of an LDC customer.

evidence of complaints, corrective action, requests to report future violations and an assurance that the manufacturer would similarly correct future violations. *Id.* at 1535. Here, there is only evidence of the natural contacts between a supplier and its customer. The *Hughes Helicopter* case merely concluded that there was a reasonable inference of a conspiracy created by the evidence in *that* case. In a case in which the plaintiff made a similar argument, *Winn v. Edna Hibel Corp.*, 858 F.2d 1517 (11th Cir.1988), the court distinguished the *Hughes* case and concluded that the plaintiff's proof did not exclude the possibility of independent actions. The evidence here (or lack thereof) is more similar to that in *Winn.* *See also Dunnivant v. Bi–State Auto Parts, supra.*

In *Todorov v. DCH Healthcare Auth.*, 921 F.2d 1438, 1455 (11th Cir.1991), the court stated that, "Even where a single firm's restraints directly affect prices and have the same economic effect as concerted action might have, there can be no liability under § 1 in the absence of an agreement." The court emphasized that "before analyzing the reasonableness of any alleged restraint on trade, courts must first ensure that an *agreement* to restrain trade exists." (Emphasis added). There is no substantial evidence of such an agreement here.[80]

■ Having determined that plaintiff's evidence does not support the inference of a conspiracy, the court next addresses plaintiff's monopoly and "essential facilities" claims against Southern. With regard to this contention, the court notes the case of *City of Chanute v. Williams Natural Gas Co.*, 955 F.2d 641 (10th Cir., 1992). In *Chanute*, eight municipalities sued a natural gas company alleging that the company had violated the Sherman Antitrust Act by terminating a temporary program whereby the cities could purchase gas from third party suppliers which Williams would transport over its pipeline. The Tenth Circuit found no violation and that plaintiffs had not met their burden of showing that no alternative to the facility existed.

■ In the instant case, defendant Southern claims that, although it had declined to allow GUA individual taps, the company had access to its pipeline. Specifically, Southern asserts that GUA could have negotiated with an LDC such as Alagasco or an industrial end user such as Hunt Refining to allow it to use one of its taps. Plaintiff has testified that it approached Hunt Refining about obtaining a tap and that Hunt refused. The record does not indicate whether GUA approached Alagasco or any other entity about obtaining taps. There is also evidence that Southern offered access other than in the form of individual taps. In the absence of any evidence that would indicate that GUA had no alternative to Southern's pipeline that was feasible, the court cannot find that plaintiff has made out a claim under the essential facilities doctrine. "As the word essential indicates, [the Cities] must show more than inconvenience or even some economic loss; [they] must show that an alternative to the facility is not available." *City of Chanute,* at 648. Even assuming that the evidence is sufficient to prove that Southern or Alagasco has a monopoly, there is no evidence that either used its power to enhance or maintain its position. *See Fulton v. Hecht,* 580 F.2d 1243 (5th Cir.1978). There is no evidence that Southern's or Alagasco's purpose was to garner more market share or to accomplish any other anticompetitive end. *Mr. Furniture v. Barclays American/Commercial, Inc.,* 919 F.2d 1517 (11th Cir.1990). On these facts, GUA has failed to meet this burden. Therefore, plaintiff's Section 2 claims are due to be dismissed.

■ Plaintiff's tortious interference claim also fails. In *Dunnivant v. Bi–State Auto Parts,* 851 F.2d 1575, 1583–84 (11th Cir. 1988), the court addressed a claim of tortious interference with business relationships. The court stated:

Dunnivant also asserts a state tort claim against the appellee retailers. Dunnivant argues that under Alabama law the actions of the retailers caused tortious interference with his business relationships. In

---

**80.** In *Jayco,* Judge Goldberg stated, "Moreover, the party opposing summary judgment may not rely merely on the pleadings or even on conflicting testimony, but must introduce 'significant *evidence* demonstrating the existence of a genuine fact issue.' " *Id.,* 777 F.2d at 308. Plaintiff has not met its burden to prove a conspiracy or other illegal agreement.

Griese–Traylor Corp. v. First National Bank of Birmingham, 572 F.2d 1039 (5th Cir.1978), this court held that "in Alabama, a defendant will not be liable where it acted for legitimate economic reasons. Bona fide business competition is a justification for intentional interference with a competitor's business." *Griese*, 572 F.2d at 1045. In *Beasley–Bennett Electric Co. v. Gulf Coast Chapter of National Electrical Contractors Assn.*, 273 Ala. 32, 134 So.2d 427 (1961), the plaintiff advanced essentially the same claim Dunnivant now asserts. In *Beasley*, the plaintiff asserted unlawful interference with his business relations where defendant/contractors refused to do business with the plaintiff and told other construction companies that if they accepted bids from the plaintiff, the defendants would not give any bids to these companies in the future. The Alabama Supreme Court held that these allegations were insufficient. The court added that "[c]ompetition in business, even though carried to the extent of ruining a rival, constitutes justifiable interference in another's business relations, and is not actionable...." *Beasley*, 134 So.2d at 429; *see, e.g., Battles v. San Ann Service, Inc.*, 441 So.2d 925, 928 (Ala.Civ.App.1983). In light of this authority, we are persuaded that Dunnivant cannot recover on his state tort claim.

*Id.*, 851 F.2d at 1583.

Here, there is no evidence that Alagasco took any action except to respond to possible competition. *Cf., Bridgeway Communications, Inc.*, 562 So.2d 222 (Ala.1990). *See also Public Systems, Inc., Inc. v. Towry*, 587 So.2d 969 (Ala.1991) and *Betts v. McDonald's Corp.*, 567 So.2d 1252 (Ala.1990). Southern took no "affirmative" actions. Further, for the same reasons discussed with reference to the antitrust preparedness issue, there is no evidence of an injury caused by the defendants.[81]

An appropriate judgment will be entered.

---

81. With regard to the "consummation of contracts" factor, it is not clear whether this refers to contracts with the plaintiff's customers or its suppliers. Here, there is neither.